## Case No. 9,735.

### MONTGOMERY v. BEVANS et al.

[1 Sawy. 653; 4 Am. Law T. Rep. U. S. Cts. 202.] [1]

Circuit Court, D. California. Aug. 26, 1871.

MEXICAN LAND GRANTS—VAN NESS ORDINANCE—GRANT BY ALCALDE — ATTEMPT TO REVOKE — GRANT TO ONE DECEASED—STATUTE OF LIMITATIONS—ABSENCE—PRESUMPTION OF DEATH.

1. An alcalde of the pueblo of San Francisco, in 1846, had no authority to revoke a grant once made by him and delivered, or to mutilate its record. A mutilation of a record by him did not operate to divest a title already passed to the grantee.

2. When a party has been absent seven years without being heard of, the presumption of law then arises that he is dead. But when a party is once shown to be alive, the presumption of law is that he continues alive until his death is proved, or the rule of law applies by which such death is presumed to have occurred, that is, at the end of seven years. This presumption of life is received in the absence of any countervailing testimony, as conclusive of the fact establishing it for the purpose of determining the rights of parties as fully as the most positive proof. The only exception to the operation of this presumption is when it conflicts with the presumption of innocence, in which case the latter prevails.

[Criticised in People v. Feilen, 58 Cal. 224.]

3. The presumption of the continuance of life rebutted in this case by evidence tending to show that the absent party met his death soon after his disappearance.

4. A grant of land in the pueblo of San Francisco, by an alcalde in 1846 to a person deceased, was void.

5. The city of San Francisco presented her claim for confirmation to the board of land commissioners created under the act of congress of March 3, 1851 [9 Stat. 631]; the board confirmed the claim to a portion of the land, and rejected it for the balance; an appeal was taken by the city from this decision to the district court

¹ [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission. 4 Am. Law T. Rep. U. S. Cts. 202, contains only a partial report.]

of the United States; the case was then transferred to the circuit court of the United States for the district of California; and by that court a decree was rendered May 18, 1865, confirming the claim of the city to four square leagues of land, subject to certain reservations and exceptions therein mentioned. From this decree an appeal was taken to the supreme court of the United States, and whilst the case was pending there, congress passed the act of March 8, 1866 [13 Stat. 332], "to quiet the title to certain lands within the corporate limits of the city of San Francisco," by which act all the right and title of the United States, to the land situated within the corporate limits of the city, confirmed by the decree of the circuit court, were relinquished and granted to the city, and the claim of the city to the land was confirmed, subject, however, to the reservations and exceptions designated in the decree, and upon certain trusts as to the disposition of the land: *Held*, that by this act the government determined the conditions upon which the claim of the city should be recognized and confirmed, and that the title of the city, therefore, rests upon the decree of the circuit court, as modified by the act of congress—that is, her title is that which is recognized and established by the decree as thus modified. The decree must be read precisely as if the conditions prescribed in the act of congress had been inserted in the decree by the court.

[Cited in San Francisco v. U. S., Case No. 12,316.]

6. The claim of the city of San Francisco, as successor of the pueblo, to her municipal lands, was founded upon the general laws of Mexico, by which pueblos, or towns, once established and officially recognized, were entitled for their benefit, and the benefit of their inhabitants, to the use of lands embracing the site of such pueblos, or towns, and of adjoining lands within certain limits. No assignment of these lands having been made to the pueblo under the former government, the claim or right of the city was an imperfect one, requiring recognition and confirmation in the mode prescribed by congress, like other claims to property of an imperfect character derived from Spanish and Mexican authorities.

7. By the fifth section of the act of congress of July 1, 1864 [14 Stat. 4], "To expedite the settlement of titles to lands in the state of California," all the right and title of the United States to the lands within the limits of the city, as defined by its charter of 1851, were granted to the city for the uses and purposes specified in the Van Ness Ordinance, subject to certain exceptions designated. These exceptions consisted of all sites or other parcels of land which had been, or were then, occupied by the United States for military, naval, or other public uses, or such other sites or parcels as might thereafter be designated by the president within one year after the rendition to the general land office by the surveyor-general of an approved plat of the exterior limits of the city, as recognized by the section, in connection with the lines of the public surveys: *Held*, that the exception from the grant of such parcels as might be subsequently designated by the president, did not defeat the entire grant; and that if the exception were not void for repugnancy, the title of the United States to the lands specified must be regarded as having passed by the act to the city with a right in the United States to resume the title to parcels upon the designation of the president within a specified period.

[Cited in Harris v. McGovern, 99 U. S. 166.]

8. The adverse interest of the government to the lands within the corporate limits of 1851 being released by the act of July 1, 1864, the titles conferred by the Van Ness Ordinance became perfect legal titles. The act operated upon such titles as effectually as a patent would have done, and the right reserved to the United States

did not affect the perfect character of those titles.

[Cited in Harris v. McGovern, Case No. 6,125; Whitney v. Morrow, 112 U. S. 696, 5 Sup. Ct. 334.]

[Cited in Ohm v. San Francisco, 92 Cal. 455, 28 Pac. 585.]

9. The sixth section of the state statute of limitations of 1863, providing in substance that parties claiming real property under title derived from the Spanish or Mexican governments, or the authorities thereof, which had not been finally confirmed by the United States, or its legally constituted authorities, shall be limited to five years after its passage, within which to bring an action for the recovery of the property or its possession, but if the title had been thus finally confirmed, the parties shall be subject to the same limitations as though they derived their title from any other source, that is, shall have five years from such final confirmation, is invalid so far as it applies to actions for the recovery of real property founded upon titles derived from Mexican or Spanish authorities, perfected after its passage, either by act of congress or by judicial decree, survey and patent, and that, as to titles thus perfected, the ordinary period of limitation must be allowed from the date of their consummation, which exists with reference to actions on complete titles from other sources.

[Cited in Le Roy v. Carroll, Case No. 8,266; Henshaw v. Bissell, 18 Wall. (85 U. S.) 270.]

10. The act of congress of March 3, 1851, passed in execution of the obligation of the United States, under the stipulations of the treaty by which California was ceded, to protect the holders of titles derived from Mexican or Spanish authorities, is not subject to any constitutional objection, so far as it applies to titles of an imperfect character; that is, to titles which require further action of the political department of the government to render them perfect; and the action of the government under this act, and the rights of possession and enjoyment which the title perfected thereby gives, cannot be defeated or impaired by any state legislation.

This was an action for the possession of a fifty-vara lot situated within the limits of the city of San Francisco, as defined by its charter of 1851; and was tried by the court without the intervention of a jury, by stipulation of the parties. The plaintiff [John B. Montgomery] asserted title to the demanded premises, under an alleged grant to his son, John E. Montgomery, issued by Alcalde Washington A. Bartlett, bearing date on the first day of December, 1846. The defendants [Thomas P. Bevans and others] claimed under a grant issued to Andrew J. Grayson by Alcalde Edwin Bryant on the twenty-sixth day of February, 1847.

It was admitted by the parties, that San Francisco was, in 1846, a Mexican pueblo, claiming title to four square leagues of land, embracing the tract upon which the present city of San Francisco is situated; that in December of that year, the above named Washington A. Bartlett was alcalde or chief magistrate of that pueblo; and that in February, 1847, Edwin Bryant was his successor as such alcalde. It was also admitted, that the city of San Francisco, as successor of the pueblo, asserted a claim for the four square leagues of land, and presented her claim for the same for confirmation to the board of land commissioners, created under the act

of congress of March 3, 1851; that such proceedings were had in the prosecution of that claim, that on the eighteenth day of May, 1865, it was confirmed by a decree of the circuit court of the United States for the district of California, to the extent of the four square leagues. From the decree of the circuit court an appeal was taken to the supreme court of the United States, and whilst the appeal was pending, congress passed the act of March 8, 1866, which is given below. The appeal was accordingly dismissed on stipulation of the attorney-general. Townsend v. Greeley, 5 Wall. [72 U. S.] 337; Grisar v. McDowell, 6 Wall. [73 U. S.] 379. The record of the proceedings in the case was presented in evidence and reference was made to it on the trial. No official survey of the tract confirmed by the decree of the circuit court has ever been approved by the commissioner of the general land office, or by the secretary of the interior. It was also admitted that the premises in controversy were within the limits of the city of San Francisco, as defined by its charter of 1851, and within the description of lands covered by the ordinance of the city called the "Van Ness Ordinance," adopted by the common council and ratified by the legislature of the state, March 11, 1858. Grayson, the grantee of the grant from Alcalde Bryant, went into immediate possession under his grant, and either he, or parties tracing title through him, have been in the uninterrupted possession of the premises, asserting ownership of the same under the grant ever since. The alleged grant to Montgomery was not produced, but the plaintiff, who is the father of the grantee, and whose deposition was taken under a commission in Pennsylvania, testified that a document of that character was delivered to him for his son in December, 1846. He was at the time a captain in the navy of the United States, in command of the sloop of war Portsmouth, lying in the harbor of San Francisco; and his statement was that the alleged grant was brought by a messenger from Alcalde Bartlett on board the Portsmouth, and delivered to him for his son, who had, about a fortnight before, sailed up the Sacramento; that the messenger brought, at the same time, three grants, one for himself, and one for each of his two sons, and delivered them all to him, the two latter to keep for his sons; and that afterwards, as he was leaving the port of San Francisco, he sent the grant for John E. Montgomery on shore to the alcalde to be kept for the grantee, as he did not expect to see him there again. It was admitted that this document could not be found among the papers of Alcalde Bartlett, or among the papers he left with his successor in office, although diligent search had been made for it.

In connection with the testimony the plaintiff offered a defaced record of the alleged grant, found in the book kept by Alcalde Bartlett, in which a record was made of

grants issued by him. The record was in the form of a certificate of the alcalde over his signature, that on the first day of December, 1846, he had, by virtue of the authority vested in him, granted the lot in question to John E. Montgomery, his heirs and assigns, and had put the grantee in full and quiet possession of the same. The signature of the alcalde is erased by lines drawn over it, but is plainly legible through the lines, and across the record the following words are written: "This title not given out in consequence of the loss of the petitioner before he could have done so. Feb. 1847. Wash. A. Bartlett, Chief Magistrate." The following is a copy of this document, the erasions and endorsement, being as above stated: "Lot No. one hundred thirteen (113), granted to John E. Montgomery. Chief Magistrate's Office, Yerba Buena. This is to certify that on the first (1st) day of December, A. D. 1846, I, Washn. A. Bartlett, alcalde or chief magistrate of San Francisco, by virtue of the authority of my office, granted, ceded, conveyed and confirmed unto John E. Montgomery, now resident in the district, the lot No. one hundred thirteen in the town of Yerba Buena, said lot being fifty Spanish varas square, and gave the said John E. Montgomery, his heirs and assigns, a full and valid title to said lot No. one hundred thirteen (113), under the form and conditions set forth in the title and recorded in this register, and that I put the said John E. Montgomery in full and quiet possession of said lot No. one hundred thirteen (113), and record the same for his security. Washn. A. Bartlett. Liber 'A' of Original Grants, page 201." The testimony of experts skilled in detecting resemblances and differences in handwriting was then taken, and from that testimony as well as from an inspection of the writings, it was clear that the lines over the signature and the writing across the record, were made by the same pen and with the same ink, and hence the court was of opinion that they were both made at the same time; that is, at the date of the latter, in February, 1847; and being also of opinion that there was no authority in the alcalde to revoke a grant once made, or to mutilate its record, admitted the record in evidence against the objection of the defendants.

It also appeared in evidence, that, besides the Portsmouth, the United States sloop of war, Warren, was, in November, 1846, lying in the harbor of San Francisco; and about the middle of that month, a launch from the Warren sailed from the harbor for Sutter's Fort, a place on the River Sacramento at a distance of about one hundred and twenty miles from San Francisco. The launch was manned by ten seamen, and was commanded by William H. Montgomery, a midshipman, and sailing-master on board the Warren. John E. Montgomery, brother of William, accompanied the launch. Both of the Montgomerys were sons of Captain Montgomery.

It was generally understood at the time, on board the Warren, that the launch was sent with money to pay the troops of the United States stationed at Sutter's Fort. The voyage between San Francisco and Sutter's Fort was often made at that time in a single day. An ordinary voyage by sail from San Francisco to the fort and back did not occupy over four or five days. The launch was propelled by both sails and oars. From the time it sailed, no intelligence had ever been received of it, or of its officers, or of any of its men. About ten days after its departure, not hearing of it, Captain Montgomery became uneasy at its absence, and sent out several boats in search of it and of his sons and the men who sailed with them, and these boats were kept on the search for about two weeks. No trace was ever found of launch, officers or men, nor has any intelligence of its or their fate ever been received since. Captain Montgomery sailed with the Portsmouth from the port of San Francisco on the fifth or sixth of December, 1846. There was testimony taken as to the manner in which alcaldes in San Francisco, in 1846 and 1847, made grants of lots in the pueblo, but this is sufficiently shown in the opinion of the court. John E. Montgomery was never married, and never made any will, and by the law of California, the father takes the estate of a child dying intestate without issue.

The following is the fifth section of the act of congress of July 1, 1864, entitled "An act to expedite the settlement of titles to lands in the state of California" (13 Stat. 332): "Sec. 5. And be it further enacted, that all the right and title of the United States to lands within the corporate limits of the city of San Francisco, as defined in the act incorporating said city, passed by the legislature of the state of California on the fifteenth of April, one thousand eighteen hundred and fifty-one, are hereby relinquished and granted to the said city and its successors, for the uses and purposes specified in the ordinances of said city, ratified by an act of the legislature of the said state, approved on the eleventh of March, eighteen hundred and fifty-eight, entitled 'An act concerning the city of San Francisco, and to ratify and confirm certain ordinances of the common council of said city,' there being excepted from this relinquishment and grant all sites or other parcels of lands which have been, or now are, occupied by the United States for military, naval, or other public uses, or such other sites or parcels as may hereafter be designated by the president of the United States, within one year after the rendition to the general land office, by the surveyor-general, of an approved plat of the exterior limits of San Francisco, as recognized in this section, in connection with the lines of the public surveys: And provided, that the relinquishment and grant by this act shall in no manner interfere with or prejudice any

bona fide claims of others, whether asserted adversely under rights derived from Spain, Mexico or laws of the United States, nor preclude a judicial examination and adjustment thereof." Under the clause of this act authorizing the president to designate other sites or parcels of land besides those previously or then occupied by the United States for military, naval or other public uses, he designated on the twelfth of October, 1866, the island of Yerba Buena, or Goat Island, for military uses. No other sites or parcels have ever been designated by him under the above act.

The following is the act of congress of March 8, 1866, entitled "An act to quiet the title to certain lands within the corporate limits of the city of San Francisco" (14 Stat. 4): "Be it enacted by the senate and house of representatives of the United States of America in congress assembled: That all the right and title of the United States to the land situated within the corporate limits of the city of San Francisco, in the state of California, confirmed to the city of San Francisco by the decree of the circuit court of the United States for the Northern district of California, entered on the eighteenth day of May, one thousand eight hundred and sixty-five, be, and the same are hereby, relinquished and granted to the said city of San Francisco and its successors; and the claim of the said city to said land is hereby confirmed, subject, however, to the reservations and exceptions designated in said decree, and upon the following trusts, namely, that all the said land, not heretofore granted to said city, shall be disposed of and conveyed by said city to parties in the bona fide actual possession thereof, by themselves or tenants, on the passage of this act, in such quantities and upon such terms and conditions as the legislature of the state of California may prescribe, except such parcels thereof as may be reserved and set apart by ordinance of said city for public uses: provided, however, that the relinquishment and grant by this act shall not interfere with or prejudice any valid adverse right or claim, if such exist, to said land or any part thereof, whether derived from Spain, Mexico or the United States, or preclude a judicial examination and adjustment thereof."

Charles T. Botts and W. W. Chipman, for plaintiffs.

Edward J. Pringle and George & Loughborough, for defendants.

FIELD, Circuit Justice. There was no authority in the alcalde to revoke a grant once made and delivered, or to mutilate its record. Neither an attempted revocation nor a mutilation of a record could operate to divest a title already passed to the grantee. If the grantee were living at the date of the grant, and thus capable of taking the title, a question which I shall hereafter consider at length, the power of the alcalde over the property was exhausted when the grant was delivered; and the record of the fact was not subject to subsequent alteration by him.

It may be proper to observe here that I do not assent to the doctrine asserted by counsel, that the record in the book of the alcalde is the grant, and that the title to the premises passed to the grantee when the signature of that officer was affixed to it. The record does not purport to be a grant of itself; it contains no words of present transfer. It only purports to declare the fact that a grant had already been made. It is undoubtedly primary evidence of that fact, but it is manifest that the alcalde did not consider this entry as the operative instrument which passed the title, but only as record evidence of his official act. The book shows on its face, and it also appears from the testimony in the case as to the mode of procedure pursued by the alcalde in making grants, that another document than the record was deemed essential to the transfer of the title, in other words, that the document intended for the grantee was considered as the grant.

I am aware of the decision of the supreme court of this state, in Donner v. Palmer, 31 Cal. 500, and have read with much interest the very able and learned opinion of Mr. Justice Sanderson in that case; and I am not prepared to question the general soundness of the views there expressed, when applied to grants made by Mexican alcaldes acting under the laws of Mexico, and adopting the forms and modes of procedure prescribed by them. But it is a matter perfectly notorious that the alcaldes in the Pueblo of San Francisco, appointed shortly after the conquest by the military or naval authorities having command of the district, knew little of Mexican or Spanish law, and less of the modes of procedure prescribed by them for the alienation of lands. They were informed, and this information was the substance of their learning on the subject, that alcaldes under the Mexican law possessed authority to make grants of town lots upon petition; and they proceeded to exercise the authority without any knowledge of the limitations upon its exercise imposed by that law, and in utter disregard of its forms and modes of procedure. The power they asserted they claimed under the law of Mexico, but in its exercise they followed the mode which was in accordance with the system of conveyancing with which they were familiar. Whether the departure from the Mexican mode affected in any respect the validity of the exercise of the power, is a question which has no practical importance. The legislation of the state and of the United States has vested in the holders of these grants, within the charter limits of 1851, an indefeasible estate, whatever the imperfection which attended their previous title.

But it is important in many cases to in-

quire into the modes of procedure adopted by the alcaldes in order to give the effect they intended to the record of their official acts. In the present case there was a delivery of the grant and the mutilation of the record was subsequently made. The present case is, in this respect, distinguished from the cases which have come under consideration by the supreme court of this state.

The testimony of the plaintiff which proves the delivery of the grant, also proves the death of the grantee, or rather proves that he has not been heard from since the fifteenth of November, 1846, and the law presumes the death of a person who has not been heard from for the period of seven years. The plaintiff claims the premises as the heir of the grantee, and relies upon the presumption of law as to the grantee's death to establish his case. And, at the same time, he relies upon what he insists is a presumption of law of equal force, that the grantee having been shown to be alive on the fifteenth of November, 1846, continued alive until the lapse of seven years, when the presumption of death arose. The counsel for the defendants, on the other hand, contend that there is no presumption of the continuance of life during this period of seven years, and that the plaintiff, asserting that the grantee was alive on the first day of December, 1846, as he must do to give efficacy to the grant of the alcalde, is bound to prove the fact; and failing to do so, his claim of title falls to the ground. The argument upon which this position is based is substantially this: The presumption of death arises from the lapse of time since the party has been heard from; for it is considered extraordinary if he was alive that he should not be heard of during this period. Now, if he is to be presumed to be alive up to the last day but one of the seven years, there is nothing extraordinary in his not having been heard of on the last day, and the previous lapse of time during which he was not heard of becomes immaterial by reason of the assumption that he was living so lately. Language similar to this is found in the opinion of the exchequer chamber in the case of Nepean v. Knight, 2 Mees. & W. 895, and hence counsel argue that there is no presumption in favor of the continuance of life during the penumbra, or death period, of seven years, for if such presumption prevailed for one day after disappearance proved, it would necessarily prevail for six years and three hundred and sixty-four days, and the whole basis upon which the presumption of death rests would become absurd. The cases of Doe v. Nepean [5 Barn. & Adol. 86], decided by the court of king's bench, of Nepean v. Knight, mentioned above, decided by the exchequer chamber, and the case of In re Phene's Trusts, recently decided by the court of appeal in chancery, in England [5 Ch. App. 139], are cited in support of this position.

In Doe v. Nepean, 5 Barn. & Adol. 86, the lessor of the plaintiff claimed the premises in controversy by title accruing on the death of one Matthew Knight, who left England for America in 1806, and was not heard of after 1807. The action was brought in 1832, and the question at the trial was whether the action was barred by the statute which limited the entry of a person into lands to twenty years after title accrued. It was admitted that Knight must be presumed to have died, more than seven years having elapsed since he was heard of, and if that presumption were referable to the time when the last intelligence was received of him, 1807, the action was brought too late; but if it arose only when seven years had elapsed from the receipt of such intelligence the action was in time. The judge before whom the case was tried was of opinion that the presumption of death only arose at the expiration of the period of seven years, or in other words the presumption of life continued until that time, and directed a verdict for the plaintiff, with leave to the defendant to move for a nonsuit. After argument upon the motion, the court of the king's bench held that the lessor of the plaintiff who gave no other evidence of Knight's death than his absence, failed to establish that his death took place within twenty years before the action was brought. Mr. Chief Justice Denman, in giving the opinion of the court, observed that though absence of a person for seven years without being heard of naturally led the mind to believe he was dead at the end of that period, it raised no inference as to the exact time of his death, and still less that death took place at the end of seven years.

In the case of Nepean v. Knight, 2 Mees. & W. 895, which was another action of ejectment, for the same premises, the same question was considered by the exchequer chamber and after elaborate argument, the doctrine laid down in Doe v. Nepean was approved, the court observing, in its opinion, that when nothing is heard of a person for seven years, it is a matter of complete uncertainty at what point of time in those seven years he died, and that of all the points of time, the last day is the most improbable and inconsistent with the ground of presuming the fact of death. And yet, in the opinion both of the king's bench, in Doe v. Nepean, and of the exchequer chamber, in this case, it is stated that the law presumes that a person once shown to be alive continues so until the contrary be shown, and that for this reason the onus of establishing the death of Knight rested upon the lessor of the plaintiff. The presumption of the continuance of life, thus stated, is inconsistent with the conclusions reached in both cases. If the presumption of life exists until death is shown, it is difficult to perceive why it should not continue when death is not shown, until the period is reached at which the law has fixed as the commencement of a different pre-

sumption. Clearly there is no rule or principle which can limit its continuance at any period within the seven years, if it be admitted to exist at all.

In the case of In re Phene's Trusts, 5 Ch. App. 139, the court of appeal in chancery held, after elaborate consideration, that the time at which a person died within the seven years was not a matter of presumption, but of proof; also that there was no presumption in favor of the continuance of life after the disappearance of the party, and that the onus of proving the death of the party at any particular time within that period, lay upon the person who claimed a right resting upon the establishment of either of these facts.

In that case it appeared that one Francis Phene had died in January, 1861, having, by his will, bequeathed the residue of his estate to his nephews and nieces in equal shares. Nicholas Phene Mill was one of his nephews, and the share to which he would have been entitled, if living, was paid into court, because it was uncertain whether he survived the testator. In 1869, letters of administration were granted to his brother, who presented a petition for the payment of the fund to him. It appeared in evidence that he left his parents' home in England, and went to America in August, 1853, and was last heard of in June, 1860. Vice-Chancellor James, to whom the petition was presented, granted its prayer, holding in deference to three previous decisions of Vice-Chancellor Kindersly and one of Vice-Chancellor Malins, that the deceased must be presumed to have survived the testator, upon the general doctrine that continuance of life once shown to exist is presumed until death is proved, or at least for a reasonable period after disappearance; but as he dissented from the decisions, he directed the fund to be retained in court until the respondents had an opportunity to bring the matter before the court of appeal.

The decision of Vice-Chancellor Kindersly proceeded upon the presumption of the continuance of life for a reasonable period after the party is shown to have been in existence; but Vice-Chancellor Malins extended the presumption of the continuance of life to the expiration of the seven years. In Re Benham's Trust, L. R. 4 Eq. 416, the doctrine held by these judges was overruled, and if the opinion of the court of appeals contains a correct exposition of the law of England, and we are bound to presume that it does in the absence of any decision of the house of lords on the subject, that law supports the position of the counsel for the defendants in this case, that the onus rests on the plaintiff of showing that John E. Montgomery, who disappeared on the fifteenth of November, 1846, and of whom no intelligence has since been received, was alive on the first day of December, 1846, when the grant of the alcalde was made.

But the law as thus declared in England is different from the law which obtains in this country, so far as it relates to the presumption of the continuance of life. Here, as in England, the law presumes that a person who has not been heard of for seven years is dead, but here the law, differing in this respect from the law of England, presumes that a party once shown to be alive continues alive until his death is proved, or the rule of law applies by which death is presumed to have occurred, that is, at the end of seven years. And the presumption of life is received, in the absence of any countervailing testimony, as conclusive of the fact, establishing it for the purpose of determining the rights of parties as fully as the most positive proof. The only exception to the operation of this presumption is when it conflicts with the presumption of innocence, in which case the latter prevails.

This rule is much more convenient in its application, and works greater justice than the doctrine which obtains in England, according to the decision in Re Phene's Trusts, that the existence of life at any particular time within the seven years, when the fact becomes material, must be affirmatively proved. In numerous cases such proof can never be made, and property must often remain undistributed, or be distributed among the contestants not according to any settled principle, but according as one or the other happens to be the moving party in court. Take this case by way of illustration: A man goes to sea on the first of January, 1860, and is never heard of again; his father makes his will and dies on the first of July of the same year, leaving him a portion of his property, and the residue to a distant relative. If persons claiming under the missing man apply for the legacy to him, they must fail, for they cannot prove that he survived the testator. On the other hand, if the residuary legatee applies for the property on the ground that the legacy to the missing man has lapsed, he must fail, for he cannot prove that the missing man died before the testator, and the proof of his death in such case would be essential to the establishment of the applicant's right.

Nor is this rule as to the presumption of the continuance of life up to the end of the seven years, justly subject to the criticism of counsel, that it renders absurd the whole basis on which the presumption of death rests. There must be some period when the presumption of the continuance of life ceases and the presumption of death supervenes; and as in all cases where the existence of a presumption arising from the lapse of time is limited by a fixed period, it is difficult to assign any valid reason why one presumption should cease at the particular time designated, rather than at some other period, and a different presumption arise, except that it is important that some time, when the change takes place should be permanently established.

It would be difficult to assign any other reason than this for the presumption which

obtains in some states, that a debt is paid, upon which no action has been brought, after the lapse of six years; and that it is unpaid up to the last hour of the sixth year. The presumption of payment arising from the lapse of time without action, it might be said with equal propriety, as in the present case with respect to the presumption of life to the end of the seventh year, that if the presumption of non-payment extends up to the end of the sixth year, it renders absurd the whole basis upon which the presumption of payment rests. So it would be difficult to give any sufficient reason for admitting in evidence a deed thirty years old without other proof of its execution than what is apparent on its face, and at the same time refusing admission to a deed except upon full proof of its execution, which has existed thirty years less one day—except that it is important that the period should be fixed at which the presumption arises which supersedes the necessity of direct proof.

But it is unnecessary to pursue the subject further. I am of opinion that the plaintiff could rely, in the first instance, upon the presumption of law as to the continuance of life to establish the fact that John E. Montgomery was alive on the first day of December, 1846, when the grant of the alcalde was issued. This leaves the plaintiff with a prima facie case of recovery.

We turn now to the consideration of the affirmative positions of the defendants. They contend that the evidence in the case rebuts the presumption of the continuance of life, and warrants the inference that the alleged grantee died previous to the first of December, 1846, and that the action is barred by the statute of limitations.

It appears from the evidence that about the middle of November, 1846, a launch from the United States sloop-of-war, Warren, a vessel then lying in the harbor of San Francisco, and, with the Portsmouth, under the command of Captain Montgomery, sailed from the harbor with ten seamen and two officers for Sutter's Fort on the Sacramento river. The two sons of Captain Montgomery were on the launch—William H. Montgomery, a midshipman and sailing-master on the sloop, Warren, had the command of it; John E. Montgomery, who was clerk of Captain Montgomery on board the Portsmouth, accompanied his brother. It was understood at the time on board the Warren that the launch was sent with money to pay troops of the United States. Sutter's Fort is distant from the harbor of San Francisco about one hundred and twenty miles, and the voyage between the two places is often made in a single day. An ordinary voyage from San Francisco to the fort and back would not occupy over four or five days. The launch in this case was propelled both by sail and by oars. From the time it sailed, no intelligence has ever been received of it, or of either of the officers, or of any of the men who accompanied it.

About ten days after its departure, Captain Montgomery became uneasy at its absence, and sent out several boats in search of his sons and the men who sailed with them, and these boats were kept on the search for about two weeks, but no trace could be found of the launch or men. Of their fate absolute ignorance has existed to this day, now nearly a quarter of a century since their disappearance. Captain Montgomery himself left the port of San Francisco with the Portsmouth on the fifth or sixth of December following.

Now it appears to me that there are only two inferences which can be drawn from these facts, when considered with reference to the character and positions of the men and officers: One is, that they died during the period within which they should have returned to San Francisco; the other is, that they deserted from the service. The latter inference cannot be entertained for several reasons: First, desertion is the highest, and with cowardice, the basest of offences which can be committed by men in the naval service; it has never, it is believed, been charged upon a naval officer of the United States; it can never, therefore, be accepted as an explanation of any act of his, except upon the clearest proof. Second, if the case had been one only of desertion, and not of death, it is highly improbable that no intelligence should have been received of any of the men during the long period which has since elapsed. Besides, with respect to the sons of Captain Montgomery, the natural effect of relationship must have led them to break the silence of years, and to seek communication with their father.

The theory of desertion would require us to believe that officers and men conspired to commit the basest of crimes, beside larceny of the public funds in their custody, and that for nearly a quarter of a century they have not only kept to themselves the secret of their crime, but have so secluded themselves, twelve in number, from observation, that no intelligence respecting any of them has reached the public.

If desertion cannot be received as a reasonable explanation of their conduct, then death must be inferred. Death is the only fact which reconciles their conduct with the presumption of innocence, and with the ordinary conduct which officers and men of the navy pursue while in the public service. It is the sole fact which satisfactorily explains, according to the common experience and knowledge of men, which are proper grounds for judgment, the failure of the officers and men to return to San Francisco, and the absolute silence of the world since respecting them.

My mind is thus led irresistibly from the evidence to the conclusion, that the officers and crew on board the launch perished on the voyage to Sacramento, within a few days after their departure from San Fran-

cisco. They probably perished in the Bay of San Pablo, or the Bay of Suisun. If the accident which occasioned their death had occurred in the Sacramento river, it is probable that some of the men would have succeeded, from the narrowness of the stream, in reaching the shore; and probably some trace of the launch would have been discovered.

Finding, as I do, that John E. Montgomery died before the first of December, 1846, the conclusion follows, that the grant of Alcalde Bartlett, intended for him, was inoperative to pass the title.

A grant to a person deceased, is void. The instrument must be issued to a person in being, or it will be as invalid as if made to a fictitious party. The position of the plaintiff's counsel, that if the grantee were dead at the date of grant, his heir-at-law took the title, is not tenable. The case of Landes v. Brant, 10 How. [51 U. S.] 373, cited in support of this position, is an authority against it. In that case, Clamorgan, the patentee, had died in 1814, and the patent issued in 1845. The supreme court said that, according to the common law, the patent was void for want of a grantee, but that the defect was cured by the act of congress of May 20, 1836 [5 Stat. 31], declaring: "That in all cases where patents for public lands have been or may hereafter be issued, in pursuance of any law of the United States, to a person who had died, or who shall hereafter die before the date of such patent, the title to the land designated therein shall inure to and become vested in the heirs, devisees and assigns of such deceased patentee, as if the patent had issued to the deceased person during life." This act, of course, had no application to grants issued by alcaldes in the pueblo of San Francisco, whose authority never extended to the alienation of any public lands, but only to lands belonging to the pueblo.

But, independently of the death of John E. Montgomery, before the first of December, 1846, the defendants have a perfect defense to the action, under the statute of limitations. The sixth section of that statute, as passed in 1850, provided that no action for the recovery of real property or its possession, should be maintained, unless the plaintiff, his ancestor, predecessor or grantor, was seized or possessed of the premises within five years before the commencement of the action. In April, 1855, this section was amended by the addition of a proviso, declaring that an action might be maintained by a party claiming real property or its possession under title derived from the Spanish or Mexican government, or the authorities thereof, if the action was commenced within five years from the time of the final confirmation of such title by the government of the United States, or its legally constituted authorities. In April, 1863, the section was restored to its original language, but a new section was enacted which, after providing that the time which had already run under the previous act, should be computed as a portion of the time prescribed as a limitation in the new act, declares "that any person claiming real property or the possession thereof, or any right or interest therein under title derived from the Spanish or Mexican governments, or the authorities thereof, which shall not have been finally confirmed by the government of the United States, or its legally constituted authorities, more than five years before the passage of this act, may have five years after the passage of this act in which to commence his action for the recovery of such real property, or the possession thereof, or any right or interest therein, or for rents or profits out of the same, or to make his defense to an action founded upon the title thereto; and provided, further, that nothing in this act contained shall be so construed as to extend or enlarge the time for commencing actions for the recovery of real estate, or the possession thereof, under title derived from Spanish or Mexican governments, in a case where final confirmation has already been had, other than is now allowed under the act, to which this act is amendatory."

By this last act, as I understand it, parties claiming real property under title derived from the Spanish or Mexican governments, or the authorities thereof, which had not been finally confirmed by the government of the United States, or its legally constituted authorities, were limited to five years after its passage within which to bring an action for the recovery of the property or its possession, but if the title had been thus finally confirmed, the parties were subject to the same limitations as though they derived their title from any other source. This construction of the act is in accordance with a recent decision of the supreme court of this state in the case of Mayor, etc., of City of San Jose v. Trimble [41 Cal. 536].

Final confirmation as defined in the act, is deemed to be the patent of the United States, or the final determination of the official survey of the land under the act of congress of June 14, 1860 [12 Stat. 33]. The effect of this statute upon the action of the plaintiff is obvious. He claims the premises in controversy under title derived from the Mexican government, not directly by immediate grant, but indirectly through the action of the alcalde. That officer only had authority to alienate lands belonging to the pueblo; and the pueblo derived its claim and interest in its municipal lands under the general laws of Mexico. Its title was derived in the strictest sense of the terms, from the Mexican government. That title, although finally confirmed in fact by the decree of the circuit court of the United States, entered in the case of San Francisco v. U. S. [Case No. 12,316], on the eighteenth day of May, 1865, and the legislation of congress upon the claim of the city has not been finally confirmed within the

meaning of the act of 1863. No patent has been issued to the city upon the decree of confirmation, and the official survey has not been finally determined under the act of congress of June 14, 1860. The case of the plaintiff falls, therefore, directly within the provision which requires the action to be brought within five years after the passage of the act.[2]

Before leaving this subject it may be proper to say a few words further upon the source of title to the land within the limits of the pueblo of San Francisco, as described in the decree of the circuit court of the United States, as there is much difference of opinion on the subject between counsel.

The city of San Francisco, as successor of the pueblo, asserted title to four square leagues of land, embracing the site of the present city, and presented her claim for the same to the board of land commissioners, created under the act of March 3, 1851. The board confirmed the claim to a portion of the land, and rejected it for the balance. The city, not satisfied with this determination, prosecuted an appeal from the decision to the district court of the United States. From that court the case was transferred to the circuit court, and by this latter tribunal the claim of the city was confirmed to the extent of four square leagues, and on the eighteenth of May, 1865, the decree was entered. In the prosecution of the case it was not contended by the counsel of the city that any specific grant of land had ever been made or issued to her by Spain or Mexico. Her claim to the four square leagues was founded upon the general laws of Mexico, by which pueblos, or towns, once established and officially recognized, were entitled for their benefit, and the benefit of their inhabitants, to the use of lands embracing the site of such pueblos, or towns, and of adjoining lands within certain limits. "This right," as was said by the supreme court in Townsend v. Greeley, 5 Wall. [72 U. S.] 336, and repeated in Grisar v. McDowell, 6 Wall. [73 U. S.] 372, "appears to have been common to the cities and towns of Spain from an early period in her history, and was recognized in the laws and ordinances for the settlement and government of her colonies on this continent. The same general system of laws for the establishment and government of pueblos and the assignment to them of lands, that prevailed in Spain, was continued in Mexico, with but little variation, after her separation from the mother country. These laws provided for

the assignment to the pueblos, for their use and the use of their inhabitants, of land not exceeding in extent four square leagues."

Upon these laws as already stated, the city rested her claim. As no assignment of lands was made to the pueblo under the former government, the claim or right of the city was an imperfect one, requiring recognition and confirmation in the mode prescribed by congress, like other claims to property of an imperfect character derived from Spanish or Mexican authorities.

From the decree of the circuit court of the United States an appeal was taken to the supreme court; and whilst the case was pending there, congress passed the act of March 8, 1866, "To quiet the title to certain lands within the corporate limits of the city of San Francisco." By this act, all the right and title of the United States, to the land situated within the corporate limits of the city, confirmed by the decree of the circuit court, were relinquished and granted to the city, and the claim of the city to the land was confirmed, subject, however, to the reservations and exceptions designated in the decree, and upon certain trusts as to the disposition of the land. "By this act," said the supreme court in Grisar v. McDowell [supra] "the government has expressed its precise will with respect to the claim of the city of San Francisco to her lands, as it was then recognized by the circuit court of the United States. In the execution of its treaty obligations with respect to property claimed under Mexican laws, the government may adopt such modes of procedure as it may deem expedient. It may act directly by legislation upon the claims preferred, or it may provide a special board for their determination, or it may require their submission to the ordinary tribunals. It is the sole judge of the propriety of the mode, and having the plenary power of confirmation, it may annex any conditions to the confirmation of a claim resting upon an imperfect right, which it may choose. It may declare the action of the special board final; it may make it subject to appeal; it may require the appeal to go through one or more courts, and it may arrest the action of the board or courts at any stage."

"The act of March 3, 1851, is a general law applying to all cases, but the act of March 8, 1866, referring specially to the confirmation of the claim to land in San Francisco, withdrew that claim, as it then stood, from further consideration of the courts under the provisions of the general act. It disposed of the city claim and determined the conditions upon which it should be recognized and confirmed. The title of the city, therefore, rests upon the decree of the circuit court, as modified by the act of congress."

By the statement that the title of the city rests upon the decree of the court, is meant that her title is that which is recognized and established by the decree. The decree must

---

[2] This view of the effect of the statute of limitations upon the right of action of the plaintiffs, is modified in the opinion filed on denying the motion for a new trial. It is there held that the statute commenced running against the action of the plaintiff, from the first of July, 1864, the date of the passage of the "Act to expedite the settlement of titles to lands in the state of California. [13 Stat. 332.] That period expired in April, 1868, and the present action was not commenced until May, 1870.

be read precisely as if the conditions prescribed in the act of congress had been inserted in the decree by the court. No one would have doubted, if that had been done, that the title was Mexican in its origin, and to be treated like other imperfect Mexican titles when confirmed by authority of the United States.

It only remains to add that judgment must be entered for the defendants. If special findings are desired, the counsel for the plaintiff will prepare them and present them to me upon notice to the counsel of the adverse parties, for settlement; otherwise a general finding will be filed.

### Motion for New Trial.

The plaintiff's attorney moved for a new trial, before Mr. Justice Field, on the ground of newly discovered evidence, and alleged error in the finding of the court, and in its ruling upon the statute of limitations. The court denied the motion immediately after the argument, but stated that perhaps its opinion on the statute of limitations might require some explanation or modification; and if satisfied upon further consideration that such was the case, it would file a supplemental opinion on that point, but that its finding as to the death of the grantee at the time the grant was issued remaining, the judgment must stand as rendered, whatever qualification might be made in the opinion upon the statute of limitations.

Subsequently the following opinion was filed:

FIELD, Circuit Justice. When the motion for a new trial was argued, the views expressed in the opinion of the court upon the effect of the state statute of limitations of 1863, and particularly as to the time it began to run against the right of action of the plaintiff, were earnestly combatted by counsel. It was contended by them, that the statute only began to run from the passage of the act of congress of March 8, 1866, and that the legal title to the premises until then was in the United States. Whilst unable to agree with counsel in this position, I was so much impressed with their argument that I was induced to reconsider the opinion, and must now qualify in some particulars its conclusions.

The sixth section of the statute of limitations of 1863, as stated, provided, in substance, that parties claiming real property under title derived from the Spanish or Mexican governments, or the authorities thereof, which had not been finally confirmed by the United States, or its legally constituted authorities, should be limited to five years after its passage, within which to bring an action for the recovery of the property or its possession, but if the title had been thus finally confirmed, the parties should be subject to the same limitations as though they derived their title from any other source, that is, they

should have five years from such final confirmation. The statute, in another section, declared that by final confirmation was meant the patent of the United States, or the final determination of the official survey of the land under the act of congress of June 14, 1860. As no final confirmation, within the meaning of the statute, that is, as no patent had been issued to the city and no official survey had been made, the attention of the court was drawn only to the provision of the statute for the commencement of actions within five years after its passage. It did not then occur to the court, and was not suggested by counsel, that in consequence of the legislation of congress by the acts of July 1, 1864, and of March 8, 1866, no patent would ever issue to the city under the decree of confirmation, and that the act of June 14, 1860, had been repealed. But such is undoubtedly the case. The act of June 14, 1860, was repealed on the first of July, 1864; and it is not the practice of the land department of the United States, and there is no occasion for such practice, to issue patents for land granted by direct act of congress. A patent necessarily rests for its validity upon the legislation of congress, and if the provisions of such legislation are complied with—and it is itself presumptive evidence of the fact—it passes all the title of the United States to the premises designated. A grant by direct act of congress differs only from a patent, in that it passes the title without any intermediate steps from the sovereign proprietor, whereas the patent is only issued through the action of subordinate officers. If any difference could exist in the grade of the two conveyances, the preference would fall to the legislative grant, as proceeding more immediately than the patent from the original source of title. But in truth, there is no such difference; both pass the title of the grantor to the extent designated.

Now, by the fifth section of the act of congress of July 1, 1864, "to expedite the settlement of titles to lands in the state of California" (13 Stat. 332), all the right and title of the United States to the lands within the limits of the city, as defined by its charter of 1851, were granted to the city for the uses and purposes specified in the Van Ness Ordinance, subject to certain exceptions. These exceptions consisted of all sites or other parcels of land which had been or were then occupied by the United States for military, naval, or other public uses, or such other sites or parcels as might thereafter be designated by the president within one year after the rendition to the general land office by the surveyor-general of an approved plat of the exterior limits of the city, as recognized by the section, that is, as defined by the charter of 1851, in connection with the lines of the public surveys.

It is contended by counsel that the exception from the grant of such parcels as might be subsequently designated by the president,

defeated the entire grant. Their position is that the act is void for repugnancy, because, to use their own language, it begins by granting all, and ends by reserving all to the grantor. But this position is clearly untenable. The grant is general, of all the lands within the limits of the charter of 1851, and the exception is of such sites or parcels of these lands as are or have been occupied by the United States, or may be designated by the president for particular uses. The power of future designation does not in terms extend so as to cover the whole grant, but only to parcels of the same. If the language of the exception would authorize, as supposed by counsel, the designation of one parcel after another until all the land granted was taken, it would not follow that the grant itself would fail, but only that the exception would be void for repugnancy. If the grant were between private parties it is possible that the exception would be regarded as void, either for uncertainty or repugnancy. The grant in such case would be taken most strongly against the grantor. But the grant here being a legislative grant, it is the duty of the court to give effect so far as possible to the intent of the legislature, if that can be ascertained, without reference to the technical rules which would control the construction of a private grant. I am, therefore, of opinion that the right of the government to designate through the president, within a limited time, parcels of land for public uses, could be maintained. It is not to be presumed that the president would exercise the right so as to defeat the general purpose of the grant, which was to quiet the title of possessors of lots in the city under the Van Ness Ordinance. In this view the title of the United States to all the lands within the charter limits of 1851, should be regarded as having passed by the act to the city with a right in the United States to resume the title to parcels of these lands, upon the designation of the president within a specified period. But, if I am mistaken in this view, the exception should be regarded as void, and the titles as having passed at once without any right in the United States subsequently to resume the title to any parcels. It is of no practical consequence in this case which construction is adopted, for no parcel within the limits of the city, lying on the peninsula west of the bay, was ever designated by the president, and the power of designation on the peninsula was released by the act of March 8, 1866, in pursuance of which the claim of the city was finally confirmed. The only designation ever made was that of the island of Yerba Buena, which is situated in the bay.

Now, though the title of the city, as stated in the previous opinion, is Mexican in its origin and was recognized and established by the decree of the circuit court of the United States, as modified by the act of congress of March 8, 1866, yet all adverse interest of the government to the lands within the corporate limits of 1851 being released by the act of July 1, 1864, the titles conferred by the Van Ness Ordinance became perfect legal titles. The act operated upon such titles as effectually as a patent would have done. The contingent right reserved to the United States did not affect the perfect character of those titles, any more than a like right of the United States to take property for public uses upon compensation affects the title of such property. There is good reason, therefore, for the position of counsel of the defendants, that the statute of limitations of 1863 began to run against the right of action of the plaintiff on the first of July, 1864, if it be held that the statute did not run from its passage.

The statute allows, as already stated, five years after its passage for the commencement of an action, provided the title has not been previously perfected by final confirmation; if thus perfected, then five years from such confirmation. It does not contemplate the case of a final confirmation subsequently made, or, rather, it gives no force to such subsequent confirmation, and herein lies the defect of the statute. It is not competent for state legislation to impair the rights of the claimant flowing from subsequent confirmation.

Upon the acquisition of California the obligation devolved upon the United States to protect the inhabitants of the territory in their property. This obligation was recognized by express stipulations of the treaty. The obligation being political in its character could be discharged, as I have often had occasion to observe in this court, and when a member of the supreme court of the state, in such manner and on such terms as the government might deem appropriate. By the act of March 3, 1851, the government determined the conditions upon which it would discharge this obligation to holders of titles from Mexican or Spanish authorities. It there established a tribunal for the consideration of all claims to land by virtue of such titles, and required their presentation before it for investigation within a prescribed period, with such evidence, documentary or otherwise, as the holders might possess; appointed law officers to appear and contest their validity; allowed appeals from the decisions of the tribunal to the courts of the United States, and provided officers to survey and measure off the lands when the claims to them were finally adjudged to be valid.

On the one hand the claimant was compelled by this act, on pain of forfeiting his land, to present his claim to it before the tribunal thus created, and was subjected to numerous and expensive proceedings to establish its justice and validity. On the other hand the government promised the claimant that if on the prescribed investigation and consideration by that tribunal, and the courts of the United States on appeal, his claim was found to be valid, it would take such ac-

tion as would render his title perfect, and give to him such evidence of ownership as would assure to him its possession and enjoyment. This legislation was not subject to any constitutional objection, so far as it applied to titles of an imperfect character; that is, to titles which required further action of the political department of the government to render them perfect. The precise point was adjudged by the supreme court of the United States, in the case of Beard v. Federey, 3 Wall. [70 U. S.] 478–490, where language respecting claims to land in California, derived from Spanish or Mexican authorities, the obligation with reference to such claims devolved upon the United States upon the cession of the country, and the character and effect of the act of congress of March 3, 1851, is used, similar to that which is expressed and repeated, so often as to become almost trite, in numerous decisions of the supreme court of this state.

The act of March 3, 1851, being constitutional, it is not within the legislative competency of the state to interfere with and defeat its operation. This follows necessarily from the sovereign and supreme authority of the United States over all matters connected with the treaty and the enforcement of obligations incurred thereby.

The statute of limitations of 1863, so far as it fixes a period after its passage within which actions must be brought for the recovery of real property claimed under titles of Mexican or Spanish origin, may not perhaps be open to any just objection where the titles are imperfect in their character and are unconfirmed. But to give effect to the statute so as to cut off or limit to the period designated after its passage, the right of action upon those titles, when subsequently confirmed and perfected, would be to defeat in many instances the legislation of congress, and render it subordinate to the action of the state.

Many of the grants, as is well known, from Mexican and Spanish authorities, were for specific quantities of land lying within exterior boundaries embracing a greater quantity. They usually contained a clause providing for official segregation of the quantity designated, with a reservation of the surplus for the benefit of the nation. They were, notwithstanding this, accompanied with conditions of cultivation and occupancy, either expressed in the grants or annexed by force of law, and a compliance with them was essential to avoid a possible denouncement and forfeiture of the land. The grantees were therefore obliged to take possession, and their right of possession necessarily extended to the entire tract. They could not set apart for themselves any particular portion of the general tract equal, in their judgment, or according to their measurement, to the quantity specified. The authority to make a segregation, remained before the cession of the country with the former government, and since the cession has remained with the new govern-

ment. The grantees were, therefore, interested to protect from injury and waste the entire tract, and to improve it, and, until official segregation, third persons could not interfere with this right to the possession of the whole. Until then, as was said in Cornwall v. Culver, 16 Cal. 429, no individual could complain, much less could he be permitted to determine in advance that any particular locality would fall within the supposed surplus, and therefore justify its forcible seizure and detention by himself. "If one person," to use the language of the court in that case, "could in this way appropriate a particular parcel to himself, all persons could do so; and thus the grantee, who is the donee of the government, would be stripped of its bounty for the benefit of those who were not in its contemplation, and were never intended to be the recipients of its favors."

Such being the rights of grantees until official segregation, the courts of this state have with strict justice given effect to them by sustaining actions of ejectment, until such segregation for the entire tract within the exterior boundaries. Much hardship has, in numerous cases, been the result of actions of this character. Many grantees throughout the country, probably the majority of them, have, therefore, from this consideration or to avoid the expenses of litigation, refrained from enforcing their rights in this respect. Now, if the statute of 1863 could be upheld when applied to actions upon titles confirmed subsequently to its passage, this absurd result would follow, if the confirmation were had more than five years afterwards, namely, that grantees would be barred from recovering the limited quantity to which they were ultimately found entitled after confirmation and survey, because they had not previously sued for and recovered a greater quantity. The grantees in that case would be required to sue, before confirmation, for more than they would be ultimately entitled to have set apart to them, and more than the former government intended to grant to them, or be barred of all right of action for the quantity actually intended and finally assigned to them.

It is evident that the state courts are incompetent to determine finally upon the rights of parties claiming by imperfect titles of Mexican or Spanish origin before their confirmation. A suit founded upon such title might be defeated by a ruling of a state court, that the grant was invalid because issued without authority, or was forged, or abandoned, or because its conditions were not complied with, and yet if the grant should be adjudged valid in the proceedings before the board of commissioners created under the act of March 3, 1851, and the tribunals of the United States on appeal from its decision, and a patent be issued, the judgment of the state court would not be a bar to a new action upon the patent. And the reason is obvious; until the government has dischar-

ged its obligations under the treaty with respect to such titles, the state court can only look into the evidence respecting them for the purpose of determining the right of their holder to present possession. It can pass no judgment which will impair the ultimate determination of the appropriate federal tribunals respecting their validity.

If an adverse judgment by a state court upon the unconfirmed title would not bar an action upon the confirmed title, it must necessarily follow that the absence of any action upon the title before confirmation cannot be effectual as a bar to an action after confirmation.

It would seem from the argument of counsel, that the difficulty experienced by them upon the subject under consideration, has arisen from the idea that its determination depends upon the character of the title derived from Mexican or Spanish authorities as equitable or legal. But, its determination does not depend upon this distinction. Equitable titles, so called, are strictly mere claims upon the government for titles, and are founded upon some service rendered or other consideration given to the government, or promise by it. They constitute no estate in the land, and, unless accompanied with the right of possession, do not authorize any action for the recovery of the land. Grants in California from Mexican or Spanish authorities conferred something more than mere equitable titles, as thus understood; they passed to the grantees a present and immediate interest in the premises designated; they conferred a legal title, though generally, for want either of departmental approval or official segregation, one which was imperfect in its character. The question in all cases of this kind, is not whether the title is equitable or legal, but whether it is perfect or imperfect. If imperfect, it is under the control of the government of the United States, and any regulations which that government may prescribe for the purpose of protecting and perfecting it. The action of that government, and the right of possession and enjoyment which perfected title gives, cannot be defeated or in any respect impaired by state legislation. As against the perfected title, the state statute of limitations can only begin to run from the date of the consummation of the title.

In the present case the act of July 1, 1864, as already stated, operated upon the premises designated in perfecting the title as effectually as a patent of the United States. It is no objection to the efficacy of the act that it was passed in advance of the period when a patent would ordinarily have been issued, and thus rendered a patent unnecessary.

It follows from the views expressed that the sixth section of the state statute of 1863 is invalid so far as it applies to actions for the recovery of real property founded upon titles derived from Mexican or Spanish authorities, perfected after its passage, either by act of congress or by judicial decree, survey and patent, and that, as to titles thus perfected, the ordinary period of limitation must be allowed from the date of their consummation which exists with reference to actions on complete title from other sources.

It follows, also, that the statute in the present case began to run against the right of action of the plaintiff on the first of July, 1864, and not on the eighteenth of May, 1863. The former opinion must, therefore, be modified in accordance with these views.

---

MONTGOMERY (BOUDEREAU v.). See Case No. 1,694.

MONTGOMERY (CHISHOLM v.). See Case No. 2,686.

MONTGOMERY (FAY v.). See Case No. 4,-709.

MONTGOMERY (GRESHAM v.). See Case No. 5,805.