## MOORE v. BANK OF BRITISH COLUMBIA et al.

(Circuit Court, N. D. California.  January 2, 1901.)

### No. 12,941.

1. RECEIVERS—GROUNDS FOR APPOINTMENT.

In a suit to recover possession of property, the appointment of a receiver to take possession of such property pending the litigation is a matter resting in the judicial discretion of the court, and to be determined with a view to the protection of the rights of all the parties. Such appointment should not be made unless it appears that the property will otherwise be in danger, and that there is a reasonable probability that the complainant will ultimately prevail in the suit.

2. SAME—PROBABILITY OF PLAINTIFF'S RECOVERY.

Complainant transferred to defendant bank certain shares of stock in a corporation to carry out an agreement made by a third party to give defendant a majority of the stock for voting purposes for the term of five years. Defendant gave complainant a receipt, by which it was agreed that at the end of five years it should return the stock or an equal number of shares, and should pay over to her all dividends which should have been paid thereon, and that all assessments on the stock during the time should be paid by complainant, "and if not so paid, and if paid by the bank, then the bank to recoup itself, with interest at six per cent. per annum, out of the subsequent dividends, holding the stock in the meantime as collateral security." Assessments were made on the stock, which were not paid by either party, and the stock was sold for their nonpayment, and purchased by the corporation. At the expiration of the five years, defendant tendered to complainant an equal number of shares, on which the assessments had been paid, conditioned upon her payment to it of the amount of such assessments, with interest, no dividends having been paid thereon. This tender complainant refused, and brought suit to compel the delivery of the stock to her unconditionally. Held that, under the agreement embodied in the receipt, it did not sufficiently appear that she was entitled in equity to recover the stock, except on payment of the assessments, to warrant the court in appointing a receiver for the stock; that such agreement imposed no duty on defendant to pay the assessments on the stock transferred, or to notify complainant of the same, and its failure to do either gave her no equities, it appearing that she had knowledge of the assessments, and did not pay the same on other stock held by her; and that the fact that the assessments on the particular shares tendered had been paid by others, to whose rights defendant had succeeded, did not inure to complainant's benefit or affect her rights.

In Equity. On motion by plaintiff for the appointment of a receiver to take possession and charge of a certain certificate of stock in controversy in the suit.

Bishop & Wheeler and Pringle & Pringle, for complainant.

Smith & Pringle and Garber, Creswell & Garber, for respondents.

MORROW, Circuit Judge. In September, 1894, the Moore & Smith Lumber Company of San Francisco and the Bank of British Columbia entered into an agreement which recited that the Moore & Smith Lumber Company was indebted to the bank in the sum of $100,000, secured by a mortgage on the Port Discovery mill and certain lumber lands in the state of Washington, and in the sum of $70,000, secured by pledge to the bank of three notes of the Kings River Lumber Company, each for the sum of $56,250, and in the sum of $1,490, secured by pledge to the bank of a certificate of stock of the Pacific

Pine Lumber Company, and that the Kings River Lumber Company was indebted to the bank in the sum of $10,000. It was further recited that it was proposed among certain creditors of the Kings River Lumber Company to form a new corporation, to be called the "Sanger Lumber Company," and that such creditors of the Kings River Lumber Company should assign their claims against the Kings River Lumber Company to the Sanger Lumber Company in exchange for the stock of the Sanger Lumber Company; that if such new corporation was formed, and the arrangement should go into effect among the creditors of the Kings River Lumber Company, then the bank would take stock in the Sanger Lumber Company, at its par value, to an amount equal to the three notes of the Kings River Lumber Company, the debt of $10,000 due the bank by the Kings River Lumber Company, and the debt of $1,490 due the bank from the Moore & Smith Lumber Company, amounting in all to $180,240, and that the bank would assign to the Sanger Lumber Company all of said notes and debts in payment for the stock of the new corporation. The agreement further provided, among other details, that the Moore & Smith Lumber Company would convey by a deed absolute, to the bank or its nominee, the Port Discovery mill and lands in the state of Washington, and that the bank would then cancel and deliver up to the company the note of the company for $100,000, which the bank held with that property as security, and would also cancel and deliver up to the company the note of the company for $70,000, which the bank held with the three notes for $56,250 each of the Kings River Lumber Company as security. It was further agreed that the bank would then open an account with the Moore & Smith Lumber Company, in which the company should be debited with the said sum of $100,000, and all taxes, insurance, and expenses connected with said mill and timber lands, and the sum of $81,491, being the actual cost to the bank of the stock of the Sanger Lumber Company, with interest on such amounts at the rate of 6 per cent. per year from July 1, 1894, and should credit the company with any dividends that might be declared on the stock of the Sanger Lumber Company, and with the proceeds of any sales of the stock or of the mill property or lumber lands made under the permission provided in the agreement. The company was also to be credited with all sums of money paid on said account, with interest on all credits at the rate of 6 per cent. per year. It was further provided that, at any time within five years from the date of the agreement (September 18, 1894), the company might pay the bank the balance of the debt shown by the account, and on such payment the bank should cause to be conveyed to the company all then remaining unsold of the mill and timber lands, and should transfer and deliver to the company all the stock of the Sanger Lumber Company remaining unsold. At the end of five years from the date of the agreement, the balance of the debt shown by the account should be due and payable by the company to the bank, and if not paid the bank might foreclose its lien for the same against said mill and timber lands, and might sell any or all of the stock of the Sanger Lumber Company then remaining unsold, at either public or private sale, with or without notice, and without any previous demand

or notice to the company, and at any such sale might itself become a purchaser. It was further provided that the Moore & Smith Lumber Company would deliver to the bank, and cause to be transferred to it or to its nominees on the books of the corporation, sufficient stock of the Sanger Lumber Company, in addition to that which it was to take as security as provided in the agreement, to give the bank a majority of the issued stock and the control of the corporation. This latter stock to be delivered to the bank was not, however, to be held by the bank as security for the account of the Moore & Smith Lumber Company, but only in trust for the purpose of giving the bank the power to vote it. This agreement between the Moore & Smith Lumber Company and the bank contained other stipulations as to the account, but the foregoing are all that it will be necessary to refer to in determining the matter now in controversy.

Soon after this agreement was entered into the Sanger Lumber Company was formed as a corporation, with a capital stock of $600,-000, divided into 24,000 shares, of $25 each. It appears that the number of shares of stock subscribed and actually issued was 23,849¼ shares, and among the shares so subscribed and issued were 7,209½ shares isued on October 22, 1894, in certificate No. 1, in the name of Walter Young, trustee. The par value of these shares of stock amounted to $180,237.50, and were the shares which the Bank of British Columbia was entitled to receive under the terms of the agreement with the Moore & Smith Lumber Company. On December 17, 1894, certificate No. 1, for 7,209½ shares of stock, was returned to the Sanger Lumber Company and canceled, and on that day two certificates were issued in lieu thereof, namely, certificate No. 69, for 7,208½ shares, in the name of Walter Young, trustee, and certificate No. 70, for 1 share, in the name of Walter Young. On September 13, 1899, certificate No. 69, for 7,208½ shares, was returned to the company and canceled, and one certificate, No. 142, for 5,000¾ shares, was issued; and on September 30, 1899, another certificate was issued for 2,207¾ shares, making the total of certificate No. 69 for 7,208½ shares. The former of these last two certificates, namely, the one numbered 142, for 5,000¾ shares, is the property in controversy in this case. It appears, further, that prior to November 17, 1894, the Sanger Lumber Company issued the following certificates of stock in that corporation: No. 43, for 1,250 shares; No. 44, for 1,250 shares; No. 45, for 1,250 shares; No. 46, for 625 shares; No. 47, for 625 shares; and No. 48, for 625¾ shares,—making a total of 5,625¾ shares. These shares were all issued in the name of A. D. Moore, trustee, for the Moore & Smith Lumber Company. On November 17, 1894, the Moore & Smith Lumber Company, by A. D. Moore, its president, executed three promissory notes to Frances J. P. Moore, the plaintiff in this case, in the sum of $19,374.43 each, and as collateral security for the payment of the notes the company added to the notes a recital that it had deposited with Mrs. Moore the above-described shares of stock in the Sanger Lumber Company; that it would pay all assessments levied on the stock, and, failing to do so, the payee might pay the same, and add the amount, with interest, to the notes. A. D. Moore, who, as president of the Moore & Smith Lumber Company, signed

these notes, and deposited with Mrs. Moore the shares of stock of the Sanger Lumber Company, was also president of the latter company, and the husband of Mrs. Moore.

On December 19, 1894, certificate No. 43, for 1,250 shares, certificate No. 45, for 1,250 shares, and certificate No. 48, for 625¾ shares, of the stock of the Sanger Lumber Company, making a total of 3,125¾ shares, were deposited with the Bank of British Columbia by Mrs. Moore. Prior to February 14, 1895, certificate No. 44, for 1,250 shares, appears to have been returned to the Sanger Lumber Company, and divided into two certificates, and reissued in certificate No. 91, for 450 shares, and certificate No. 92, for 800 shares, both certificates being issued in the name of A. D. Moore, trustee, for the Moore & Smith Lumber Company; and on February 14, 1895, this certificate No. 92, for 800 shares, was deposited with the Bank of British Columbia by Mrs. Moore, while on June 28, 1895, 1,075 shares. were deposited with the same bank by Mrs. Moore, being certificate No. 91, for 450 shares, and certificate No. 46, for 625 shares. The total number of shares of the stock of the Sanger Lumber Company contained in these three deposits was 5,000¾ shares, Mrs. Moore retaining certificate No. 47 for 625 shares. For these shares of stock the bank issued to Mrs. Moore three receipts, the first dated December 19, 1894, for 3,125 (3,125¾) shares, the second dated February 14, 1895, for 800 shares, and the third dated June 28, 1895, for 1,075 shares. These receipts recited that these several certificates of stock so deposited were issued in the name of A. D. Moore, trustee, for the Moore & Smith Lumber Company, and so indorsed in blank by him as such trustee, and held by Frances J. P. Moore as collateral security for debts due to her by the Moore & Smith Lumber Company. With respect to the first deposit of certificates, aggregating 3,125 (3,125¾) shares, the receipt recited that the certificates were delivered by her to the bank with the consent of the Moore & Smith Lumber Company; that the stock might, at the option of the bank, be reissued in such other name as the bank might elect; that the stock was to remain in the hands of the bank for five years from September 18, 1894, and with the obligation of the bank at the end of that time to hand back to the said Frances J. P. Moore, her heirs or assigns, the said stock, or an equal number of shares of said stock, and pay over to her, her heirs or assigns, all dividends declared and paid during said five years on said stock as the same were declared and paid,—it being understood that all assessments on said stock during said time should be paid by said Frances J. P. Moore, and if not so paid, and if paid by the bank, then the bank to recoup itself, with interest at 6 per cent. per annum, out of the subsequent dividends, holding the stock in the meantime as collateral security. It was further recited in the receipt that it was understood that the stock was not delivered to the bank as collateral security for any debt or claim due to it by the said Frances J. P. Moore, or any other person or company, but to enable the said Moore & Smith Lumber Company to carry out its agreement with the bank dated September 18, 1894, to give the bank a majority of the stock of the Sanger Lumber Company for the purpose of voting it. The other two receipts, given to Mrs. Moore by the bank for stock

106 F.—37

deposited on February 14, 1895, and June 28, 1895, referred to the first receipt, and made its terms and conditions part of those receipts. The certificates described in these three receipts were returned to the Sanger Lumber Company and canceled, and new certificates issued in the name of Walter Young, trustee, as follows: No. 72, for 3,125¾ shares; certificate No. 94, for 800 shares; and certificate No. 109, for 1,075 shares,—making a total of 5,000¾ shares. The bank then had in its possession, in the name of Walter Young and Walter Young, trustee, 12,211¼ shares, or a majority of the stock of the Sanger Lumber Company.

On January 9, 1896, an assessment of $2.50 per share was levied by the Sanger Lumber Company upon its stock. The subscribed and issued stock of the company was at that time 23,849¼ shares. The shares which are material to this case were those which represented the original pledge to the bank of 7,209½ shares, 1 share of which stood at this time in the name of Walter Young, and 7,208½ in the name of Walter Young, trustee; the 5,000¾ shares issued in the name of A. D. Moore, trustee for the Moore & Smith Lumber Company, and pledged to Mrs. Moore as collateral security, and by her transferred to the bank (these shares at this time also standing in the name of Walter Young, trustee); 625 shares remaining in the possession of Mrs. Moore, issued in the name of A. D. Moore, trustee, for the Moore & Smith Lumber Company; 6,495½ other shares standing in the name of A. D. Moore, trustee; and 222 shares in the name of the Moore & Smith Lumber Company. These shares aggregated 19,552¼ shares.

A. D. Moore, the husband of the complainant, was president of the Sanger Lumber Company, and presided at the directors' meeting of January 9, 1896, when the assessment of that date was levied, and voted for the assessment. At the delinquent sale under this assessment the company bought in 11,512¾ shares of the stock of the company upon which the assessment had not been paid, reducing the outstanding stock to 12,336½ shares. The shares purchased by the company included the 5,000¾ shares transferred to the bank by Mrs. Moore; the 625 shares represented by certificate No. 47, which was retained by Mrs. Moore; and all the stock belonging to the Moore & Smith Lumber Company. The 12,336½ shares of stock upon which the assessment was paid included the 7,209½ shares pledged to the bank as security. In addition to the assessment of January 9, 1896, six other assessments were levied between that date and December 14, 1897. The first five of these assessments were for $2.50 per share, and the last or seventh assessment was for $4.75 per share, making a total of $19.75 per share. The bank paid all the assessments on the 7,209½ shares held by it in pledge. amounting to $142,387.63, charging the several assessments so paid in open account against the Moore & Smith Lumber Company as further advances secured by the stock and the lumber mill and timber lands in the state of Washington. No personal notice was given by the bank to Mrs. Moore of the levy of the first assessment or of the delinquent sale of the 5,000¾ shares of stock deposited by her with the bank.

On September 19, 1899, the day following the expiration of the five years mentioned in the agreement of September 18, 1894, between the

Moore & Smith Lumber Company and the bank, Mrs. Moore demanded of the bank a return to her of 5,000¾ shares of the stock of the Sanger Lumber Company, when the bank tendered to her certificate No. 142, in the name of Walter Young, duly indorsed by him, for 5,000¾ shares, at the same time demanding from her, as a prerequisite to the delivery of the stock, the sum of $98,750, which had been paid as assessment upon the stock. This payment Mrs. Moore refused to make, claiming that she was entitled to have the stock delivered to her unconditionally. The present action has been brought to recover this stock, and the complainant now moves the court to appoint a receiver to take possession and custody of the stock pending the result of the action.

The appointment of a receiver is, as a general rule, discretionary with the court, but this discretion is not arbitrary or absolute, but it is a sound judicial discretion, which takes into account all the circumstances of the case, and is exercised for the purpose of protecting the rights of all the parties to the action and in the property in controversy. 3 Pom. Eq. Jur. § 1331. In the present case the question whether a receiver should be appointed involves the inquiry (1) whether the property, if left in the hands of the present holder, is in any danger: and (2) whether there is a reasonable probability that the complainant will ultimately prevail in the action.

With respect to the first inquiry, it is alleged by the complainant that the 5,000¾ shares of the stock of the Sanger Lumber Company in the name of Walter Young enables the Bank of British Columbia to control the Sanger Lumber Company; that it has voted said stock contrary to her best interests, and in favor of the sale of the entire property of the Sanger Lumber Company, and that the board of directors of the Sanger Lumber Company, acting under the control of said bank, threaten to complete the sale of the entire property of the company; that the bank is about to transfer its business and assets to the Canadian Bank of Commerce, and thereafter retire from business; and that a transfer of the said stock to the Canadian Bank of Commerce would be highly prejudicial to the interests of complainant, and prevent her recovering the same. This last charge is met by the affidavit of Walter Young that while it is true that the Bank of British Columbia is about to transfer its business and assets to the Canadian Bank of Commerce, and thereafter retire from business, it is not true that a transfer of the stock of the Sanger Lumber Company, represented by certificate No. 142 to the Canadian Bank of Commerce, would be highly or at all prejudicial to the interests of the complainant, or prevent her recovery thereof, because, by arrangement between the Bank of British Columbia and the Canadian Bank of Commerce, it is agreed that the Canadian Bank of Commerce shall assume all the obligations of the Bank of British Columbia of every kind and nature, and that the Canadian Bank of Commerce is as well able to meet any demands of the complainant herein as the Bank of British Columbia would be; that after the transfer of the business and assets of the Bank of British Columbia to the Canadian Bank of Commerce affiant will continue to hold said certificate No. 142 for the Canadian Bank of Commerce as he has held it heretofore for the

Bank of British Columbia, and that said certificate No. 142 will continue to be, as it has heretofore been, within the jurisdiction of this court, and subject to its orders and decrees herein. Manifestly, there is no danger to the specific shares of stock, if left in the hands of the present holder. He will continue to hold them to await the result of this litigation, and that is all that could be secured by placing them in the hands of a receiver. This ground for the appointment of a receiver has therefore not been established.

The next question relates to the injury likely to result to the complainant's interests by reason of the possession of the stock by the defendant, and the control of the Sanger Lumber Company thereby secured during the litigation. This raises the question whether, upon the facts stated, there is a reasonable probability that the complainant will succeed in this action. In other words, is it probable, as the case now appears, that the court will decree that the defendant must deliver to the complainant 5,000¾ shares of the capital stock of the Sanger Lumber Company unconditionally?

The complainant bases her claim to the stock in question upon the terms of the receipt executed by the bank for the deposit of the original certificates. These certificates were issued in the name of A. D. Moore, trustee for the Moore & Smith Lumber Company, and were indorsed by Moore in blank. In this form they were delivered to the bank, and the bank, in receipting for the certificates, provided that the certificates might, at the option of the bank, be reissued in such other name as the bank might elect. The stock was to remain in the hands of the bank for five years from September 18, 1894. It was not, however, delivered to the bank as collateral security for any debt or claim due to it by the complainant, or any other person, but to enable the Moore & Smith Lumber Company to carry out its agreement with the bank to give the bank a majority of the stock of the Sanger Lumber Company for the purpose of voting. The receipt contained also the following reciprocal conditions: (1) The bank obligated itself to pay over to the complainant, her heirs and assigns, all dividends declared and paid on the stock during the five years the stock should remain on deposit with the bank; (2) all assessments on the stock during the time should be paid by the complainant, and if not so paid, but were paid by the bank, the bank would be entitled to recoup itself, with interest at 6 per cent. per annum, out of subsequent dividends, holding the stock in the meantime as collateral security. These conditions must all be read together; they all form part of the contract of deposit. If dividends were paid by the company, then such dividends were to be paid to the complainant, her heirs or assigns; they were not to enter into the account with the Moore & Smith Lumber Company or be otherwise diverted. On the other hand, complainant was to pay all the assessments levied upon the stock during the time. The proviso that, if she did not pay the assessments and they were paid by the bank, the bank should be entitled to reimburse itself out of subsequent dividends, was not an express or implied obligation assumed by the bank that it would pay in the event the complainant did not pay the assessments, but it was a further condition that if it did pay assessments it would be entitled to charge interest at 6 per

cent. per annum until reimbursed out of subsequent dividends, with the right to hold the stock in the meantime as collateral security. There does not appear to be any ambiguity in the terms of this agreement, and, standing alone, it certainly does not give the complainant any right to the stock unconditionally, and without paying the assessments levied and paid upon the equivalent number of shares tendered by the bank. The failure of the bank to notify the complainant of the assessment of January 9, 1896, and subsequent delinquent sale of the stock, does not alter the condition. The bank did not agree to notify her when assessments were levied nor of the sale of delinquent stock; besides, it does not appear that such a notification would have resulted in her paying the assessment. She had 625 shares in her possession upon which she failed to pay the first assessment, and it was sold and purchased by the company for such delinquency. If she failed to pay her assessment upon the stock retained by her, what reason is there for supposing that she would have paid the assessment upon the stock deposited with the bank? Moreover, her husband, A. D. Moore, was president of the Sanger Lumber Company, and presided at the meeting at which the assessment was levied. He was also the president of the Moore & Smith Lumber Company. No assessment was paid upon the stock of the Sanger Lumber Company held by the Moore & Smith Lumber Company, and that stock was also sold for the delinquent assessment.

It appears, further, that Moore was an active business man in all these transactions, and acted for his wife in the deposit of the stock with the bank. Under such circumstances, it may be fairly assumed that his knowledge of the assessment was communicated to her, and that they both determined not to pay the assessment on any of the stock in which they were interested. But a fact needs to be stated in this connection which the complainant may rely upon as rebutting this presumption. It appears that at the time of the levy of the first assessment by the Sanger Lumber Company, and from that time until some time after the sale of the delinquent stock, the company was indebted to the complainant in the sum of about $40,000. This debt would, of course, have been more than sufficient to pay the assessment if it could have been so arranged. But such an arrangement does not appear to have been contemplated. On the contrary, it appears that, after the levy of the first assessment, A. D. Moore applied to the Bank of British Columbia, and requested it to advance to the Moore & Smith Lumber Company the amount of the assessment on the shares of stock of the Sanger Lumber Company owned by the Moore & Smith Lumber Company, including the 5,625¾ shares which had been pledged by the Moore & Smith Lumber Company to the complainant, and of which shares the complainant had transferred 5,000¾ shares to the bank. This application was based upon the representations made by Moore to the bank that, unless aided by the bank, the Moore & Smith Lumber Company would be unable to pay the assessment upon the stock mentioned. Under this state of facts, the failure of the bank to notify the complainant of the assessment and sale of her stock does not give her now an equitable right to recover from the bank, free of assessment, the shares of stock in controversy.

It is next contended that the tender made by the bank to the complainant on September 19, 1899, of 5,000¾ shares, and the conduct of the bank in acquiring the full title to such shares preparatory to such tender, was an admission on the part of the bank that it understood its obligation to be to return the stock or equivalent shares to the complainant at the expiration of five years from September 18, 1894, absolutely and without any conditions. It appears that on the 21st of September, 1898, the Bank of California recovered a judgment against the Moore & Smith Lumber Company in a suit pending in the superior court of the state of California for the sum of $19,936.18 and costs, and on the 25th day of October, 1898, execution was issued and a levy made upon the interest of the Moore & Smith Lumber Company in the 7,209½ shares of the stock of the Sanger Lumber Company pledged to the Bank of British Columbia; that at the sale under this execution the Bank of California became the purchaser of the stock, and subsequently Walter Young, acting for the Bank of British Columbia, bought the interest of the Bank of California in this stock for the sum of $100; that on September 13, 1899, Walter Young, for the bank, caused certificate No. 69, for 7,208½ shares, in the name of Walter Young, trustee, to be canceled, and two certificates to be issued in its place,—one, No. 142, for 5,000¾ shares, issued September 13, 1899, and another for 2,207¾ shares, issued September 30, 1899,— both in the name of Walter Young. It is evident that this last transaction, whereby the bank secured a certificate for the exact 5,000¾ shares of the stock of the Sanger Lumber Company, was intended to place the bank in position to meet any demand that might be made by the complainant for her stock on the expiration of the five years mentioned in the receipt issued by the bank, but it does not follow that it was an admission that the bank was obligated to hand over to the complainant the stock free from assessments. On the contrary, the tender must be considered as qualified by its terms and by the terms of the agreement under which the stock was deposited with the bank. Those terms required the complainant to pay the assessments on the stock, or, in default thereof, the stock to remain in the possession of the bank as collateral security for whatever advances the bank might make in paying the assessments. The claim that the conduct of the bank was inequitable in allowing the stock to be sold for the assessment, for the reason that it increased the value of the stock remaining in its possession, cannot be sustained upon the facts presented to the court upon this motion. Whether stock in a corporation upon which assessments have been paid is increased in value by the purchase by that company of the delinquent stock depends entirely upon the financial condition of the corporation. It frequently happens that corporations become so involved that stockholders deem it more advantageous to surrender their stock than to continue to pay assessments. In such cases there is no presumption that the remaining stockholders are benefited by the surrender of any of the stock for failure to pay assessments; on the contrary, the presumption would ordinarily be the other way.

It is next claimed that the assessments upon the stock tendered to the complainant by the bank have in fact been paid by the Moore &

Smith Lumber Company. This claim is based upon the fact that, under the terms of the agreement between the Moore & Smith Lumber Company and the bank, the latter, in its open account with the Lumber Company, has charged the assessments on the 7,209½ shares of stock to that company. The complainant's rights are, however, in no way connected with this specific stock. Her claim runs against the 5,000¾ shares deposited by her with the bank, or an equal number of shares of stock of the same company. Because the assessments upon the stock tendered to her have been charged by the bank to the Moore & Smith Lumber Company is not an equity in her favor nor a legal fact to her credit in determining her right to the stock unconditionally.

It appears, further, that on September 19, 1899, there was due and owing from the Moore & Smith Lumber Company to the Bank of British Columbia, under the agreement of September 18, 1894, on the open account therein mentioned, the sum of $433,103.79, and that the bank, on the 2d day of April, 1900, caused an action to be instituted against the Moore & Smith Lumber Company and certain other defendants, in the superior court of the state of Washington, in and for the county of Jefferson, in which the Port Discovery mill and lands are situated, for the purpose of foreclosing the lien created as security for the amounts due under the said agreement; that this action is now pending in said court; that upon a final judgment the property will be sold; that the mill and lands described are not worth more than $100,000, which amount the bank will bid if there is no better bid for the property; that in this event there will be due the bank the sum of $350,000, for which sum the bank will have no security or property whatever out of which said sum of $350,000 can be obtained, belonging to the Moore & Smith Lumber Company, except the said 7,209½ shares of the Sanger Lumber Company; that the 5,000¾ shares of the Sanger Lumber Company involved in this action, with all assessments paid, are not worth more than their par value of $25 per share, or about $125,000. In view of these facts, there is no difficulty in determining the real interests and substantial rights of all the parties to this controversy, and it will not be necessary to further review the transactions involved herein. In whatever light they may be considered, they do not appear to establish the legal or equitable rights contended for by the complainant. Equity always attempts to get at the substance of things, and to ascertain, uphold, and enforce rights and duties which spring from the real relations of parties. It will never suffer the mere appearance and external form to conceal the true purpose, objects, and consequences of a transaction. 1 Pom. Eq. Jur. (2d Ed.) § 378. It follows, from what has been stated, that it does not appear that the complainant will probably prevail in this action, and the motion for the appointment of a receiver must therefore be denied.