KELLEY et al. v. BOETTCHER et al.

CURRAN et al. v. CAMPION et al.

(Circuit Court, D. Colorado. September 28, 1898.)

Nos. 3,265 and 3,298.

1. RECEIVERS—GROUNDS FOR APPOINTMENT—PRELIMINARY HEARING.

On a preliminary hearing for the appointment of a receiver, the questions which should be determined are whether it is probable that, on the final hearing, the allegations of the bill will be made good by competent proof, and whether the character and situation of the property are such that it ought to be taken into judicial custody in the meantime, for the purpose of preserving the rights of all parties.

2. SAME—INSUFFICIENCY OF SHOWING.

Where defendants in a suit for the recovery of property and an accounting for profits have been in undisturbed possession for a number of years under an apparently good title, the presumptions of law are in their favor; and if they are solvent and able to respond for any injury done to the property, as well as for any profits that may be derived from it after the application is preferred, a receiver will not be appointed.

These are suits in equity for the cancellation of conveyances of mining property and an accounting for profits therefrom. Heard on preliminary applications for an injunction and the appointment of a receiver.

E. B. Green, for complainants.

Charles J. Hughes, Jr., for defendants.

THAYER, Circuit Judge.    The application which has been made in each of the above-entitled cases for an injunction and the appointment of a receiver for the Little Johnny lode mining claim is based upon bills of complaint which contain collectively the following allegations:    About the year 1880, Thomas J. Kelley and others located the Little Johnny mining claim, on Breece Hill, near Leadville, Colo. Thereafter, in November, 1886, Thomas J. Kelley died, seised of an undivided one-sixth interest in said claim, which interest, upon his death, became the property of the complainants in case No. 3,265, who were his heirs at law.    John Curran was also one of the locators of said mining claim, and he also died on August 19, 1890, seised of another undivided one-sixth interest in said claim, which became the property of the complainants in case No. 3,298, who were his heirs at law.    The defendants Boettcher, Campion, Hunter, and some other persons wrongfully acquired possession of said Little Johnny mine in January, 1883, and retained such possession until March, 1891, during which period they worked said mine successfully, and appropriated all the net proceeds thereof, which amounted to not less than $5,000,000, over and above all operating expenses.    In January, 1891, the defendants Boettcher, Campion, Hunter, and others organized the Ibex Mining Company, and thereupon turned over the possession of the aforesaid mine to said mining company, of which they were directors and managers.    When the mine was thus turned over to the Ibex Mining Company, it was a valuable gold mine, worth from $25,-000,000 to $50,000,000, which had already yielded gold ore worth $5,000,000; and, since it has been in the possession of the Ibex Mining Company, it has continued to produce not less than $300,000 per month, all of which the defendants, including said Ibex Mining Company, have wrongfully and fraudulently appropriated to their own use. The Ibex Mining Company was organized by the individual defendants above named, not in good faith, but for the sole purpose of using the same as a means of defrauding the heirs of Kelley and Curran, and depriving them of their rightful interests in the Little Johnny mining claim.    In execution of such fraudulent purpose, the defendants, in November, 1892, employed one Charles C. Reger as their agent, to negotiate for the purchase of the interest of the Kelley heirs in said claim.    Reger visited Galena, Ill., where said Kelley heirs resided, and succeeded in buying all the right, title, and interest of said heirs in and to said mining claim for the sum of $1,000.    The conveyance of said interest was made by the Kelley heirs to the defendant Boettcher on January 16, 1893, and was induced by false and fraudulent representations of said Reger, to the effect that the Little Johnny mining claim was of no value; that no ore of any consequence had ever been discovered in the claim; that the shafts which had been sunk thereon were then filled with water; that no one could examine the mine because of the water; that it would cost an immense sum to drain the property; and that the property had never paid expenses. When these representations were made, the mine was in fact of

immense value, as the defendants were well aware, and they had already received about $1,000,000 for ores previously extracted therefrom, which sum in fact belonged to the complainants, as the heirs of said Thomas J. Kelley. The purchase price of the mine was paid out of the previous products of the mine, which belonged to the complainants, and other portions thereof had been invested by the defendants in the purchase of several adjoining mining claims, which were also of great value. About the month of August, 1893, the defendants employed Edward Dale and Charles C. Reger to purchase the one-sixth interest of John Curran (who was then deceased) in the Little Johnny mine; and through the joint efforts of said Dale and Reger, and by means of false and fraudulent representations similar to those last above described, they succeeded, on September 7, 1893, in obtaining from the heirs of said John Curran (who are the complainants in case No. 3,298), a conveyance of all their right, title, and interest in and to said mine, including a relinquishment of all their claims on account of ore previously extracted therefrom, for the price and sum of $3,500. The conveyance by the Curran heirs was made to the defendant A. V. Hunter, but eventually Boettcher and Hunter conveyed the interests in the mine which they had respectively acquired to the Ibex Mining Company. Such, in substance, are the material allegations contained in the bills of complaint, and the relief prayed for is the cancellation of the respective conveyances by the heirs of Kelley and Curran to Boettcher and Hunter, and the cancellation of the conveyances subsequently made by them to the Ibex Mining Company. The bills also seek an accounting and general relief.

The defendants have each filed lengthy answers to the respective bills, in which they deny, under oath and in detail, all charges of fraud and collusion therein contained. In support of the bills and answers, numerous affidavits have been read by the parties, all of which have received careful attention. As a result of such examination of the moving papers, one general conclusion may be announced at the outset, namely, that the allegations made by the complainants in their respective bills touching the output and value of the Little Johnny mine are grossly exaggerated and misleading, and that other statements therein contained concerning the time and manner in which the defendants first acquired possession of the property in controversy are without foundation in fact. The testimony heard in support of the motions satisfies the court that none of the defendants had any connection with the Little Johnny mine, or interest therein, until about March 15, 1891. The evidence shows, and there is no proof to the contrary, that Thomas J. Kelley, John Curran, and other locators of the Little Johnny claim, entered into a contract for the sale of a five-sixths interest therein to one Henry M. Dunning and others, some time in the year 1880; that the purchase price was to be paid by Dunning and his associates only out of the net profits which they might derive from working and developing the claim; that Kelley and Curran and the other locators of the claim turned over the possession thereof to Dunning and his associates when the contract of sale was executed, by whom and their successors in interest the mine was worked at intervals until about March 15, 1891; and

that during said period there was a net loss of about $110,000, in attempts made to find ore and work the mine at a profit.    In March, 1891, the defendant John F. Campion and others were employed by the then owners of the Dunning contract, to wit, by F. F. Jeffrey and John Harvey, to further develop and work the mining claim in question, under an agreement whereby Campion and others were to work and develop it at their own expense, and were to receive for their services 85 per cent. of the net smelter returns of all ore yielding less than $20 per ton, and 80 per cent. of all ore yielding more than $20 per ton.    This contract of employment was transferred by Campion and his associates to the Ibex Mining Company, which was organized in March, 1891; and under the provisions thereof the mining company continued to develop and work the mine until some time in the year 1895, when the interests of the Kelley and Curran heirs, and some other interests which had then been purchased, were conveyed to it. Such, in brief, as disclosed by the proofs now before the court, would seem to be a correct account of the defendants' early connection with the mine in controversy, and of its output down to the month of March, 1891.    Up to that time it had not yielded any returns over the aggregate cost of development, but showed an excess of expenditures over receipts amounting to $110,000.    Subsequently to March, 1891, the mine was confessedly worked at a profit.    It stands admitted by the answers and affidavits which have been filed by the defendants that after the Ibex Mining Company acquired possession of the property, on March 30, 1891, and between that date and January 16, 1893, when the Kelley interest was conveyed to Boettcher, ores were extracted from the mine by the Ibex Company which were of the gross value of $260,060.93.    The defendants say, however, and the court sees no reason for doubting the statement, that these returns were obtained at a cost of at least $150,000, of which sum over $125,000 was expended in development work done upon the mine before any profit was realized.

In view of these admissions, it is obvious that the statements which are said to have been made to the Kelley and Curran heirs by Reger and Dale in the years 1892 and 1893, to induce them to part with their interests in the mine, were false and misleading, and operated as a fraud if the complainants were in fact influenced by such representations to part with their interest in the property.    The chief questions, therefore, to be considered on the present occasion, are these:    Were the alleged representations in fact made by Reger and Dale to induce the conveyance of the complainants' interests in the mine, and were Reger and Dale acting at the time as agents of the defendants or either of them in making the purchase?    As the case is now before the court on a motion for the appointment of a receiver, it would be manifestly improper to prejudge the case by a definite finding upon either of these issues of fact.    A sound rule which ought to be observed on such preliminary hearings is that the court should determine whether it is probable that on the final hearing of the case the allegations of the bill will be made good by competent proof, and whether the character and situation of the property is such that it ought to be taken into judicial custody in the meantime,

for the purpose of preserving the rights of all parties in interest. If, upon a careful consideration of the pleadings and other moving papers, there is a strong probability of ultimate recovery, and the character of the property is such that it may deteriorate in value before there can be a full and final investigation of the case, the right and duty of the court to appoint a receiver is clear. Pom. Eq. Jur. (2d Ed.) § 1331, and citations. The converse of this proposition must also be true: that if a recovery on final hearing seems doubtful, or if it is probable that the property in controversy will not suffer any deterioration in value prior to that time, or if the defendants have been in the undisturbed possession of the property for a number of years under an apparently good title, and are solvent and abundantly able to respond for any injury that may be done to it, as well as for any profits that may be derived therefrom after the application for a receiver is preferred, then a receiver ought not to be appointed. Adequate reasons should exist and be shown in all cases to warrant a court in depriving parties of the possession of property to which they have a good record title, and of which they have had peaceful possession for a series of years. All of the presumptions of law are in their favor.

Proceeding in accordance with these views, it is to be observed that the defendants, in their several answers, have denied under oath, but on information and belief, that either Reger or Dale made the false representations which are set forth in the two bills of complaint. This denial of the alleged fraud is supported by the affidavits of Reger and Dale, in which they respectively deny under oath, and in positive and direct terms, that they made the alleged false statements and representations which are attributed to them in the bills of complaint. Moreover, the defendants have denied under oath, both by answer and affidavit, that either Reger or Dale acted as their agent in purchasing the interests of the Kelley and Curran heirs in the Little Johnny mine; the contention of the defendants being that these interests were purchased by Reger and Dale on their own account, as a private speculation, after they had ascertained by conversations with Hunter and Campion at what price the interests of said heirs could be resold if they succeeded in buying them. In other words, the defendants deny under oath all accountability for the acts of Reger and Dale, whatever they may have been, on the ground that they never employed or authorized them to purchase the interests of the Kelley and Campion heirs in their name or on their account. It may be conceded, on the other hand, that the complainants have filed a few affidavits which give some additional weight to the charge contained in the bills that Reger and Dale made the representations therein alleged to induce the complainants to sell their interests in the mine; but the court is not able to say that they have produced any additional proof that, in making the purchase, either Reger or Dale was acting as agent for the defendants, or either of them. The charge that they were so acting is supported simply by the averments of the bills and such inferences as may possibly be drawn from the manner in which the conveyances of those interests were executed. The court is of opinion, therefore, that a correct conclusion touching the charge of fraud which is contained in the bills can only be reached

after a full opportunity has been afforded for the examination and cross-examination of witnesses, and that, on the present showing, it would not be warranted in ousting the defendants from the possession of the property on the assumption that the fraud charged in the bills will probably be established on the final hearing of the case. The court is furthermore of opinion that it is unnecessary at present to appoint a receiver of the property in controversy for the purpose of guarding against possible loss or damage to the complainants, even if it should be conceded that the moving papers do disclose a reasonable probability of ultimate recovery. It is obvious that the appointment of a receiver will afford the complainants no protection for what has already been done or accomplished, and that such action could only be justified on the ground that it is necessary to protect the complainants against some future loss which seems imminent.

In view of this fact, it will be well to refer briefly to the present situation of the property, as disclosed by the evidence. The complainants charge in their bills, and support the charge, possibly, by one or more affidavits, that the defendants are making vigorous efforts to exhaust the mine, and conceal the products thereof, before a final determination of the case can be reached. On the other hand, the defendants have filed affidavits of persons who are doubtless entirely familiar with the past and present output of the mine and its present condition, showing that the total net product of the mine for the two years preceding September 8, 1898, has not exceeded $36,000; that no ore has been shipped or mined from the Little Johnny lode for the past six months; that the great bulk of ore heretofore taken from the lode which paid smelter charges ran from $15 to $30 per ton; that the cost of mining the same was somewhat in excess of $9 per ton; that the highest of the smelter returns from ore ever taken from the lode was $197.04 per ton; that the mine is what is known as a "wet mine," requiring constant pumping by a large and expensive pumping plant to keep it free from water and prevent its destruction; and that the pumping plant by which said mine and several other mines in the immediate vicinity are now, and for some years past have been, kept free from water, is located on one of said other claims, known as the Uncle Sam lode mining claim. It furthermore appears that the Ibex Mining Company and the individual defendants as well are entirely solvent, and able to respond for the value of such ores as may in future be extracted from the property in controversy, and that they have made no effort to conceal or remove their property, or any of it, beyond the jurisdiction of the court. In view of these sworn statements, which the court on the present showing sees no reason to distrust, the conclusion is inevitable that it would not be warranted in appointing a receiver or granting an injunction. Such action on the part of the court, if taken, might well be characterized as an abuse of judicial discretion. In the opinion of the court, adequate relief will be afforded to the complainants by requiring the defendants to file in court, for inspection by the complainants, a map or plat showing all of the present underground workings of the Little Johnny mine, and also requiring them to file within the first 15 days of each month, beginning with October, 1898, a sworn statement made by the superin-

tendent of the mine, showing the total quantity of ore extracted from the mine during the preceding month, and, by reference to the aforesaid map, the place whence it was derived, and the smelter returns therefrom. Such an order will be entered, and the application for a receiver and an injunction will be denied.