FOLK et al. v. UNITED STATES et al.

(Circuit Court of Appeals, Eighth Circuit. June 5, 1916.)

No. 4464.

*(Syllabus by the Court.)*

1. APPEAL AND ERROR ⬤⟝954(1), 955—REVIEW—DISCRETION OF COURT—APPOINTMENT OF RECEIVER—INJUNCTION.

Interlocutory orders appointing receivers and issuing injunctions generally rest in the sound judicial discretion of the court of original jurisdiction, guided by the principles and rules of equity jurisprudence, and when the court has not departed therefrom its orders may not be reversed without clear proof of an abuse of its discretion.

But when, in the consideration and decision of the issue, a court has departed from the principles and rules of equity established for the guidance of that court, the order may be reviewable on that ground without proof of abuse of discretion.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3818, 3819, 3821, 3822; Dec. Dig. ⬤⟝954(1), 955.]

2. RECEIVERS ⬤⟝27—APPOINTMENT—GENERAL RULES.

It is the general rule that a court of equity will not appoint a receiver of real estate, or of its proceeds, in the possession of defendants holding under a regular title during the pendency of the suit, although it has the power to do so in exceptional cases.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. § 36; Dec. Dig. ⬤⟝27.]

3. RECEIVERS ⬤⟝27—APPOINTMENT—GROUNDS.

In order to bring a case within the exceptions to this general rule there must be clear proof (1) that there is imminent danger that unless a receiver is appointed the property, or its proceeds, will be materially deteriorated in value or wasted; (2) that the plaintiff will suffer irreparable loss from such deterioration or waste, and he can rarely suffer such loss when the defendants are solvent and abundantly able to respond to any damage they cause, or where they will give a good bond of indemnity against it; (3) that upon the pleadings and preliminary proofs there is a strong probability that the plaintiff will ultimately recover.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. § 36; Dec. Dig. ⬤⟝27.]

4. INJUNCTION ⬤⟝36(2)—RECEIVERS ⬤⟝27—APPOINTMENT—GROUNDS.

A court of equity is sedulous to prevent the successful invocation of its preliminary injunction or appointment of a receiver to perform the function of a successful action of ejectment, while the plaintiff at the same time avoids the trial of titles indispensable to the success of such an action.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. § 83; Dec. Dig. ⬤⟝36(2); Receivers, Cent. Dig. § 36; Dec. Dig. ⬤⟝27.]

5. RECEIVERS ⬤⟝27—APPOINTMENT—GROUNDS.

The United States, on behalf of the Creek Tribe of Indians, and that tribe, which owned the land in controversy before it was allotted and patented to Thomas Atkins, who was enrolled by the Dawes Commission a member of the Creek Tribe by blood, brought a suit in equity to avoid the enrollment, allotment, and patent under which the defendants were in possession of the land, upon the ground that there was no information or evidence before the Commission of the qualifications of Atkins to be enrolled, and especially that there was none that he was living on April 1, 1899. Upon voluminous evidence the plaintiff secured, before a trial of the suit, the appointment of a receiver of the land and of all the improvements and property placed thereon by the defendants, as well as of

⬤⟝For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

233 F.—12

all the oil the latter had produced at an expense of more than $125,000, while they had received in return only about $8,000, and an injunction against their interference with the property thereafter.

*Held*, as there was no satisfactory evidence of imminent danger of deterioration, or waste of the property by the defendants, or of probable irreparable loss to the plaintiffs, or of the fact that there was a strong probability that the plaintiffs would ultimately prevail in the suit, while there was proof that the defendants were solvent and able to respond for any loss or damage they caused, and they offered to give a good bond of indemnity for the benefit of all parties which should be ultimately adjudged to be entitled to the land, or its proceeds, the order appointing the receiver could not be sustained.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. § 36; Dec. Dig. ⊜⟶27.]

6. INDIANS ⊜⟶13, 27(6)—LANDS—CONCLUSIVENESS OF ADJUDICATION.

The adjudications by the Dawes Commission of the enrollment of Indians and the allotment of their lands and the patents issued thereon are conclusive and impervious to collateral attack.

In suits in equity to avoid them by direct attack the burden is on him who attacks them, and he may successfully assail neither of them by doubtful evidence, or a mere preponderance of it. He may succeed only by full proofs, clear, convincing, unambiguous, and entirely satisfactory to the court on every material issue.

[Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 19, 30; Dec. Dig. ⊜⟶13, 27(6).]

7. DEATH ⊜⟶1—INDIANS ⊜⟶13—ENROLLMENT—PRESUMPTION AS TO CONTINUANCE OF LIFE.

The Creek rolls of 1890 and 1895 constituted substantial evidence before the Dawes Commission that those named thereon were qualified for enrollment, that they were living when the rolls were made, and, in the absence of proof that the persons enrolled were, in 1895 or subsequent, in unusual danger of earlier death, that those persons continued to live for seven years after the roll of 1895 was made.

In the absence of proof of earlier death, or of evidence of unusual danger of earlier death, the legal presumption is that a person living at a certain time continues to live for at least seven years thereafter.

[Ed. Note.—For other cases, see Death, Cent. Dig. §§ 1–3; Dec. Dig. ⊜⟶1; Indians, Cent. Dig. § 30; Dec. Dig. ⊜⟶13.]

8. UNITED STATES ⊜⟶126—ACTIONS—PARTIES—PECUNIARY INTEREST.

Where the United States has no pecuniary interest in the litigation, but brings its suit as the representative of the real party in interest, in this case the Creek Tribe, the equities of the United States are no greater or less than those of the real party in interest. The stream may not rise higher than its source.

[Ed. Note.—For other cases, see United States, Cent. Dig. § 115; Dec. Dig. ⊜⟶126.]

9. INDIANS ⊜⟶3, 27(1)—UNITED STATES ⊜⟶70, 126—ESTOPPEL—ACTIONS.

The equities of the Creek Tribe, or of the United States, appeal to the conscience of a chancellor with the same, but with no greater or less, force than would those of a private individual in like circumstances. The United States and the Creek Tribe are bound and estopped by their contracts, such as the Creek Agreement, to the same extent as private individuals would be.

When the United States, or the Creek Tribe, or a state, submits its rights and claims to a court of equity and prays its relief, those rights and claims, laying aside mere delay, are governed, measured, and adjudicated by legal estoppel, by equitable estoppel, and by the other rules

⊜⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

and principles of equity jurisprudence that would be applicable to like rights and claims of individuals in similar circumstances.

[Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 5–7, 11, 19; Dec. Dig. &3, 27(1); United States, Cent. Dig. §§ 53, 115; Dec. Dig. &70, 126.]

**10. ESTOPPEL &87—EQUITABLE ESTOPPEL—ELEMENTS.**

In equity no one may successfully deny to the damage of another the truth of his statements or representations by which he has purposely or carelessly induced another to so change his situation that the assertion of the truth will irreparably or seriously injure him.

[Ed. Note.—For other cases, see Estoppel, Cent. Dig. §§ 230–234; Dec. Dig. &87.]

Appeal from the District Court of the United States for the Eastern District of Oklahoma; Ralph E. Campbell, Judge.

Suit in equity by the United States of America and another against Minnie Folk (née Atkins) and others. From an order appointing a receiver, defendants appeal. Reversed and remanded.

This is an appeal by the defendants below from the order of the District Court appointing a receiver of oil-producing land of which they were in the exclusive possession and which they were operating under these circumstances:

Thomas Atkins was listed for enrollment as a member of the Creek Tribe of Indians by the Dawes Commission on May 23, 1901, was duly enrolled as such a citizen by that Commission, was on March 1, 1902, reported to the Secretary of the Interior to have been regularly listed for enrollment and enrolled by it, to have been one of the Creek citizens "living on the 1st day of April, 1899, or born to citizens so entitled to enrollment up to and including the 1st day of July, 1900, and then living," to have been found upon the 1895 authenticated Creek tribal roll and to have been enrolled by it as No. 7913 on its roll, and a copy of the part of that roll containing his enrollment and the enrollment of some others was submitted with the report which the Commission closed with this statement: "The Commission, after having thoroughly examined the rolls of the Creek Nation, and such evidence as has been submitted touching the identification of the persons on roll herewith submitted, is of the opinion that all are entitled to enrollment as Creek citizens by blood and should be so enrolled." The part of the roll so certified to the Secretary was approved by him, the land in the defendants' possession was allotted to Thomas Atkins, a certificate of allotment thereof to him was issued on June 30, 1902, patents therefor dated April 14, 1903, approved by the Secretary on May 8, 1903, were issued to him and were recorded in the office of the Commission on May 16, 1903. The defendants, Charles Page and R. A. Josey, hold an oil and gas lease from Mr. McNab, the grantee of Minnie Folk, formerly Minnie Atkins, the alleged mother and sole heir of Thomas Atkins. Under this lease and under an order of the district court of Creek county, Okl., dated July 3, 1914, in a suit between Minnie Folk and Page and Josey and others, permitting Page and Josey to possess and operate the leased property for oil and gas, Page and Josey were in exclusive possession of the land in controversy, drilling wells and producing oil, when, on February 15, 1915, the United States, on its own behalf and on behalf of the Creek Tribe of Indians, brought this suit against them to cancel and avoid the enrollment of Thomas Atkins as a Creek citizen, the certificate of allotment and the patents of the land to him, to perpetually enjoin him and all claiming under him from asserting any interest therein, or in the proceeds thereof, and for the appointment of a receiver pending the suit to take possession of the land and to impound and preserve the oil and gas therein for the benefit of the United States and the Creek Tribe. This is a suit in equity, and the only equity pleaded in the complaint was that the Dawes Commission was charged with the duty of determining who were entitled, under the acts of Congress, to be enrolled as citizens of the Creek Nation, that no one was entitled to be so enrolled who was not living on April 1, 1899, that Thomas Atkins was not living on that

day, "that no evidence of any character was produced before, or obtained or had by, said Commission with respect to the right of the alleged Thomas Atkins under said act of Congress to be so enrolled," and that in causing his name to be placed on the roll of Creek citizens by blood the Commission acted arbitrarily and summarily, and without any knowledge, information, or belief that he was in existence or living or dead on April 1, 1899. If the complaint had not contained these allegations it would have stated no ground for the cancellation of the enrollment, the allotment or the patents and hence no ground for any relief by a direct attack in equity, for those muniments of title were conclusive adjudications of Thomas Atkins' right to enrollment and of his title to the land impervious to collateral attack. The complaint contained the further averments, futile to invoke equitable relief unless the averments stated above were established, that the plaintiffs had no knowledge and could not allege whether such a person as Thomas Atkins of Creek Indian blood so enrolled ever existed, but it alleged that if he did he died prior to April 1, 1899, that because there was no evidence or information before the Commission of his qualifications for enrollment the muniments of his title should be swept away, the title to the land should be quieted in the Creek Nation, which owned it before its allotment, and a receiver should be appointed to take possession of the land and to impond and conserve the oil and gas for the benefit of the Creek Tribe during the pendency of the suit.

The answer of Page and Josey denied all the allegations of the complaint tending to disclose any equity in the plaintiffs, alleged that there was evidence of the qualifications of Thomas Atkins for enrollment before the Commission, set forth the defendants' exclusive possession and title, alleged that in reliance upon the enrollment, allotment and patent the defendants in good faith purchased and paid more than $30,000 for their title under Thomas Atkins and had expended more than $200,000 for drilling wells and developing the production of oil from the land without any knowledge or notice of any defect, or claim of defect, in the title of Thomas Atkins under his patents. Nancy Atkins, one of the defendants, who claimed that she was the mother and heir of Thomas Atkins, joined with the plaintiff in the application for the appointment of the receiver. On that application affidavits, testimony, and copies of records occupying more than 400 pages of the printed transcript were submitted to the court. At the close of the evidence Page and Josey offered to give a bond in such amount and with such sureties as the court should approve to account for and pay over to the parties ultimately adjudged entitled thereto, the profits of the oil extracted from the premises during the pendency of the suit, and all damages that might result from their operation, but the court declined to accept any bond and made an order appointing the receiver.

C. B. Stuart, of Oklahoma City, Okl., and E. C. Hanford, of Seattle, Wash., for appellants.

R. C. Allen, of Muskogee, Okl., National Creek Atty., W. P. Z. German, Sp. Asst. U. S. Atty., of Muskogee, Okl. (D. H. Linebaugh, U. S. Atty., and J. C. Davis, Asst. National Creek Atty., both of Muskogee, Okl., on the brief), for appellees.

Malcolm E. Rosser and Napoleon B. Maxey, both of Muskogee, Okl., for appellees Nancy Atkins, Robert L. Rutherford, and James A. Ferguson.

Before SANBORN and CARLAND, Circuit Judges, and TRIEBER, District Judge.

SANBORN, Circuit Judge (after stating the facts as above). [6] In this case there are many defendants, but the defendants in possession of the property and who chiefly contest the appointment of the receiver are Page and Josey, and in this opinion they will be designated as the defendants. These defendants were, and for many months

had been, in the exclusive possession of the land which is the subject of this controversy, exploring it for oil and gas and extracting oil from it under patents and a title fair on their face and adjudged valid, so far as the defect asserted in this case is concerned, the right of Thomas Atkins to enrollment as a Creek citizen by the Dawes Commission, a quasi judicial tribunal, to which, by the Creek Agreement, the Congress and the Creek Tribe intrusted the power and upon which it imposed the duty to decide that question, a tribunal whose jurisdiction of that question and of every other issue it was necessary for it to consider and determine in reaching its decision was conclusive upon all and impervious to collateral attack, either by the Creek Nation, the United States, or any other party in interest. Kimberlin v. Commission of Five Civilized Tribes, 104 Fed. 653, 662, 44 C. C. A. 109, 118; Malone v. Alderdice, 212 Fed. 668, 670, 129 C. C. A. 204, 206. To avoid this incontrovertible rule the Creek Tribe and the United States, for the sole benefit of the Creek Tribe, make this direct attack upon the decision and judgment of the Dawes Commission that Thomas Atkins was entitled to enrollment as a member of the Creek Tribe and upon the patents based on that adjudication by a complaint in equity to avoid and set them all aside on the ground that there was no information or evidence before the Commission to sustain its adjudication.

The claim of the Creek Tribe, the only party plaintiff that has any pecuniary interest in this litigation, is conditioned by the existence of its alleged right to avoid that adjudication and the patents founded on it on the ground that there was no evidence of the qualifications of Thomas Atkins for enrollment before the Commission which adjudged him entitled thereto and no evidence before it that he was living on April 1, 1899. That adjudication, the allotment of this land to Thomas Atkins, and the patents to him were all public records open to the inspection of the Creek Nation from 1903 until the present time, but no attack upon their justice or verity was ever made until this suit was filed in 1915, more than 11 years after the completion of the adjudication, the patents, and the public record thereof. This land was of small value, of but a few dollars an acre, until about 1912 to 1914, when oil was discovered in its vicinity and the defendants purchased their lease, drilled wells in it, and demonstrated its great value for its oil. Wells were being drilled in 1914 and the early part of 1915 on all sides of this land, and to save the oil from being drawn out of the pool beneath by others, the defendants sank four wells in it at a cost of $44,000, were drilling six more at an expense of $11,000 each, had constructed many wooden tanks, had contracted for eight steel tanks at a cost of $11,000 each to hold the oil which the wells were producing much faster than it could be sold or piped away, and had expended and incurred expense in producing and preserving the oil in this land, which amounted in the aggregate to more than $125,000, and had collected in return only about $8,000, when on the application of the plaintiff the court below appointed a receiver of the land, of all the wells, tanks, derricks, piping, casings, and other material of every nature which the defendants owned and had placed upon the land, of all the oil they had produced from and stored upon it, and of all the

uncollected proceeds of the oil they had taken from it and sold. This order was in effect an ejectment of the defendants in possession, not only from the land, but from the improvements which they had made thereon and the oil they had produced therefrom at an expense of more than $125,000 upon a preliminary hearing, and it is difficult to perceive the compelling equity in the Creek Nation requisite to sustain it.

[1] The plaintiffs, however, invoke the familiar rule, applicable alike to the appointment of receivers and to the issue of injunctions, that interlocutory orders on these subjects rest in the sound judicial discretion of the court of original jurisdiction, and that when that court has not departed from the rules and principles of equity established for its guidance its orders in this regard may not be reversed without clear proof that it abused its discretion. American Grain Separator Co. v. Twin City Separator Co., 120 C. C. A. 644, 648, 202 Fed. 202, 206. And they invite discussion of the question whether or not there was any abuse of the discretion of the court in the action it took. But it is only when the trial court has not departed from the rules and principles of equity established for its guidance that the question of abuse of discretion in cases of this character is material. Such a departure renders the action of the court reversible without consideration or decision of the question of abuse of discretion. Now the plaintiffs' ground for this suit is that the Creek Nation has the legal title to this land, but that its title is clouded by the enrollment, the allotment, and the patents, and the equitable relief they seek is the removal of that cloud. The defendants are in possession of the land under a title regular on its face. Counsel for the plaintiffs concede and insist in their brief that they cannot recover in ejectment on their legal title until a decree in equity removes the alleged cloud under which defendants hold a regular title, and yet they have succeeded, by means of an interlocutory order, without any trial of title, in securing in effect a writ of ejectment of the defendants from the land and an injunction against their return.

[2] The possession and use of real estate by those actually in possession has always been jealously protected by English and American courts. Strangers without title may not eject those in possession although the latter have no title. The possessors have the right to a trial of the issue between legal titles by a jury and to continue in possession until the plaintiff by the strength of his own title, not through the weakness of his adversaries', establishes his right thereto. This suit is a confession that the plaintiffs cannot recover possession of this land on the strength of their title. If they could, they would have an adequate remedy at law and their suit must fail. When a plaintiff brings ejectment on a paramount legal title, and the defendant in possession sues in equity on the ground that he has the superior equity, the established rule and general practice is to stay the action at law and hold the defendant in possession until the validity of the defendant's claim in equity is adjudged. And when, as in this case, a plaintiff out of possession brings a suit in equity to avoid the legal title of a defendant in possession which is admittedly superior, it is likewise the general rule and the established practice in equity to refuse to appoint a receiver to deprive the defendant of the possession or of the product

of the property until after a full trial of the equitable claim and the legal titles on their merits.

[3] A court of equity is not without jurisdiction to appoint a receiver of real estate and of its proceeds in the possession of a defendant holding under a title regular on its face. But the cases in which it may exercise that power before a trial of the issues on the merits without a departure from the established principles and practice of equity jurisprudence are exceptions to the general rule, and clear proof of the following necessary facts is indispensable to bring such a case within the exceptions:

First: The fact that there is imminent danger that unless a receiver is appointed the property or its proceeds will be deteriorated in value or wasted during the pendency of the suit. Second: The fact that the plaintiff will suffer irreparable loss from such deterioration or waste. But if the defendant is solvent and abundantly able to respond to any such loss, or if he will give a good bond so to respond, the loss can rarely be irreparable, and the general rule is that a receiver should not be appointed. Third: The fact that on the pleadings and preliminary proofs there is a strong probability that the plaintiff will ultimately prevail on the merits.

[4] But courts of equity are extremely averse to any interference with the possession of a defendant claiming real estate under a legal title. They proceed in such a case with extreme caution and rarely interfere. If it seems doubtful whether or not the plaintiff will recover at the final hearing, or whether or not there is imminent danger that the plaintiff will suffer irreparable loss, the application for a receiver will be denied and in the hearing and decision of such a case all the presumptions are in favor of the defendant in possession under a legal title. A court of equity is sedulous to prevent the successful invocation of its interlocutory injunction, or its appointment of a receiver to perform the function of a successful action of ejectment and at the same time to avoid the trial of titles indispensable to such an action. Kelley v. Boettcher (C. C.) 89 Fed. 125, 129; Lancaster v. Asheville St. Ry. Co. (C. C.) 90 Fed. 129, 133; Sage v. Railroad Co., 125 U. S. 376, 377, 8 Sup. Ct. 887, 31 L. Ed. 694; United States v. American Tobacco Co., 221 U. S. 106, 186, 187, 31 Sup. Ct. 632, 55 L. Ed. 663; Bosworth v. Terminal R. R. Ass'n, 174 U. S. 182, 186, 187, 19 Sup. Ct. 625, 43 L. Ed. 941; Ryder v. Bateman (C. C.) 93 Fed. 16, 28, 29, 31; Trust & Deposit Co. v. Spartanburg Waterworks Co. (C. C.) 91 Fed. 324, 325, 326; Worth Mfg. Co. v. Bingham, 116 Fed. 785, 790, 792, 54 C. C. A. 119, 124, 126; Carson v. Allegany Window Glass Co. (C. C.) 189 Fed. 791, 795, 796, 797, 798, 800; Higginson v. Chicago, B. & Q. R. R. Co., 102 Fed. 197, 199, 42 C. C. A. 254; Moore v. Bank of British Columbia (C. C.) 106 Fed. 574, 579, affirmed 125 Fed. 849, 60 C. C. A. 431; High on Receivers (4th Ed.) §§ 553, 557, 558.

The cases cited by counsel for the plaintiffs neither challenge nor detract from these rules and principles. They either rest on facts so different from those of this case and of other cases which these rules govern that the cases thus cited do not fall under those principles. The cases cited are such as Fink v. Montgomery, 162 Ind. 424, 68 N.

E. 1010, wherein, at the suit of one partner a receiver was appointed of partnership property which another partner was wasting, upon the principle that each partner owns an interest in each and every item of the partnership property; Mead v. Burke, 156 Ind. 577, 60 N. E. 338, wherein a receiver was appointed of property in the hands of a vendor at the suit of a vendee who had completely performed his contract of purchase, upon the principle that in such a case the vendee holds the entire beneficial interest in the property and the vendor holds it simply as trustee for him; and Nevada Sierra Oil Co. v. Home Oil Co. (C. C.) 98 Fed. 674, wherein the plaintiff alleged that he had a valid claim to the property under the public land laws which he had a right to perfect by doing work thereon required by those laws and the defendant in possession was extracting oil from the premises and preventing the plaintiff from doing the work necessary to perfect his title, and the court remarked that if the proof reasonably sustained the plaintiff's claim it would appoint such a receiver, but that the proof was insufficient and the application was denied. That remark was justified because, if the plaintiff had a valid claim to the property and the defendant was unlawfully preventing the doing of the necessary work to perfect it, the claim would be entirely lost unless the court interfered to permit him to comply with the law. Some of the cases cited by eminent counsel are such as Elk Fork Oil & Gas Co. v. Foster, 99 Fed. 496, 39 C. C. A. 615, wherein opposing parties all out of possession had enjoined each other from extracting oil from the premises, but agreed that it was necessary to extract it in order to save it, the court appointed a receiver, there was no appeal from the order appointing him, and the only issue was his compensation, or such as Bettman v. Harness, 42 W. Va. 433, 26 S. E. 271, 274, 278, 36 L. R. A. 566, in which the court, after indulging in a lengthy discussion of the jurisdiction of a court of equity to enjoin the abstraction by the defendant of oil and gas from the land claimed by the defendant, where it is shown the abstraction would result in irreparable loss to him, said, among other things:

"It is true now, as it ever has been, that an injunction will not be granted, where the title is in dispute, previous to the determination of legal rights of the parties unless the threatened act is of such a nature that, should the right to commit it be decided against them, the consequence will be irreparable. * * * Possession is prima facie evidence of title, is sacred, and no court in any form of hearing can take it from him without a hearing without overthrowing the maxim that no man can be condemned in person or deprived of property without a day in court and due process"

—and held that the issue of a preliminary injunction restraining lessees in possession from boring for oil or interfering with the claims of the plaintiff was erroneous. We turn to the facts of the case.

[5] Did the plaintiffs in this case establish the facts that were indispensable to entitle them to the appointment of a receiver to take possession and operate this land that was then in the exclusive possession of the defendants under an apparently regular title? In their complaint they allege that the defendants were wasting the oil they were extracting from the land in controversy, but at the opening of the hearing their counsel announced that they did not expect to be able to prove that there was not a proper management of the property by

the defendants, and they produced no evidence to that effect or to the effect that there was any danger that the defendants would not properly manage it during the pendency of the suit. The evidence on this subject at the close of the hearing was that it was necessary in order to save the oil in this land to drill wells into the stratum in which the oil was found, which was about 2,600 feet below the surface, at least as fast as wells which were being drilled on adjoining lands were sunk, that the defendants had done and were doing this, that in so doing they had sunk four wells, were drilling six more, had produced and were producing so much oil, then 10,000 barrels a day, that it could not be sold and sent away as it came, so that it was necessary to tank it, that they had constructed many wooden tanks, had contracted for eight steel tanks, and had completed three, which had a capacity of 55,000 barrels, and had paid and incurred expenses to the amount of more than $125,000 in producing and saving this oil, while they had collected from the sale of it only about $8,000. There was no evidence that the defendants were insolvent, or that they were not abundantly able to pay and discharge any liability they might incur by their action and the work they had done, and the necessary expenses they had made and incurred, and the testimony in the case established their financial responsibility beyond all doubt or cavil. Not only this, but the defendants offered to the court below, and to this court, to give a bond with sufficient sureties to respond to and discharge any liability they might incur to the parties that should be ultimately adjudged to be entitled to the oil produced by them from this land during the pendency of this suit. There was, therefore, no substantial evidence of any imminent danger of irreparable loss to the plaintiffs by the possession of and the extraction of oil from the premises by the defendants; but the proof was that there was no such danger, and, if there had been, the plaintiffs could have at once removed it by the acceptance of the tendered bond. In view of this fact alone, there was no equity in the appointment of the receiver and the taking of the possession of the wells, tanks, and improvements the defendants had placed upon this land at great expense, of the land itself and its management from them, and turning them over to the officer of the court at the request of plaintiffs, that had done nothing and expended nothing to enhance the value of the land, or to discover, produce, or save the oil. The defendants had the greater equity.

The appointment of a receiver to hold and manage the property and business of owners or claimants necessarily imposes upon the parties in interest the expense of the compensation of the receiver and his counsel and generally other expenses which would be avoided by refusing the appointment. Ordinarily the personal interest of the owners or claimants in possession and their knowledge of and experience with the property and the business enable and cause them to hold and manage the property and the business with less expense and more profit than can a receiver. And where loss to the applicants during the pendency of the suits can be avoided without making such appointments the cases are rare that will warrant them.

Did the plaintiffs establish the fact that there was a strong probabil-

ity that on the merits of this suit they would finally secure the relief they seek? They ask to avoid the deliberate adjudication of the Dawes Commission rendered more than 12 years before their suit was commenced, that Thomas Atkins was entitled in 1901 to enrollment as a Creek Indian, the allotment, and the patents based thereon, upon the ground, not that the Commission was induced by any fraud or misrepresentation to render that judgment, but that there was no information or evidence before the, Commission to sustain its conclusion, and especially that there was none to warrant the indispensable preliminary finding (the Creek Agreement, Act March 1, 1901, 31 Stat. 870, c. 676, § 28; Act June 28, 1898, 30 Stat. 502, c. 517, § 21), that Thomas Atkins was living on April 1, 1899. Conceding, but not considering or deciding, that the absence of such information or evidence would be fatal to the judgment of the Commission, a proposition which counsel for the defendants strenuously challenge, was the evidence sufficient to establish that absence? The legal presumption was that there was information and evidence sufficient to sustain the judgment and the 'patents based upon it. The burden was on the plaintiffs to prove, not that there was insufficient evidence, but that there was no substantial information or evidence, to sustain the judgment. It was a heavy burden, one that could not be borne by the production of a mere preponderance of evidence, for it assails the validity of patents and of the judgment of a quasi judicial tribunal empowered to render it, and neither of them could be successfully challenged without full proofs, clear, convincing, unambiguous, and entirely satisfactory to the court. Maxwell Land Grant Case, 121 U. S. 325, 379, 381, 7 Sup. Ct. 1015, 30 L. Ed. 949; Colorado Coal Co. v. United States, 123 U. S. 307, 317, 8 Sup. Ct. 131, 31 L. Ed. 182.

The only evidence the plaintiffs produced was the affidavit of Mr. Merrick, verified February 25, 1915, more than thirteen years after the event, that in May, 1901, he was a clerk and employé of the Dawes Commission, that on May 23, 1901, he "listed for enrollment as a citizen by blood of the Creek Nation, the name of Thomas Atkins who is enrolled opposite roll number 7913 of the final roll of the Commission and on census card No. 2707, field No. 2774, a true copy of which census card is hereto attached and made a part of this affidavit," that the evidence which induced him to list Thomas Atkins was "the authenticated 1895 roll of Creek citizens, which said roll was used and relied upon by said Commission and by myself as the representative of said Commission in enrolling the name of Thomas Atkins." The census card recorded these facts: That Thomas Atkins was a Creek Indian of half blood 10 years of age, that he was enrolled on the authenticated Creek tribal roll of 1895 as of Euchee township, under the name Thos. Atkins, No. 213, and that on that roll Minnie Atkins was recorded as his mother, and a white man as his father. Mr. Merrick further deposed that he had searched and found in the office of the Dawes Commission, where all such matters are kept, no memorandum or notation indicating that evidence or information was had or received by the Commission on the question whether Thomas Atkins was living or dead on April 1, 1899, and that he had no recollection of

any such evidence or information had or received by himself, although somebody—who it was he said he could not recall—gave him information as to about the time of alleged birth and parentage of the said Thomas Atkins, that the final roll of citizens by blood of the Creek Tribe "was made up from the said census card under my personal supervision and compared and reviewed by some member of the Commission, and the enrollment thus made was approved by the Secretary of the Interior on March 28, 1902."

On the other hand, Mr. Lyons, a witness called on behalf of the defendant, personally appeared before the court and testified that he had a conversation with Mr. Merrick in which the latter called attention to the fact that the census card of Thomas Atkins showed his parentage, his mother and his father, that he could not have got that from the 1895 roll, and Lyons testified that Merrick said that he was satisfied from that fact that there must have been evidence on that question, and that there must also have been evidence or information of some character, which was not made of record, that Thomas Atkins was living on April 1, 1899, and further that he had no independent recollection of the whole matter, except that the enrollment was made in his handwriting. Mr. Lyons was cross-examined by counsel for the plaintiffs and testified that Mr. Merrick said that they must have had information as to the parentage probably from the 1895 roll, and he said also that they must surely have had information as to whether or not he was alive or dead on April 1, 1899, or they would not have enrolled him. Mr. Merrick's testimony was an ex parte affidavit in troduced two days before Mr. Lyons testified in open court, and Mr. Merrick was not called to deny that Mr. Lyons' statement of his admissions was correct.

[7] By the act of June 10, 1896, the Dawes Commission was authorized to hear and determine applications for citizenship in any of the Five Civilized Tribes. By that act the rolls of citizenship of those tribes as then existing (and the Creek rolls of 1890 and 1895 were then existing), were confirmed and the Dawes Commission was commanded in determining applications for citizenship to "give due force and effect to the rolls, usages, and customs of each of said nations or tribes." 29 Stat. 339, c. 398, par. 3. By the act of June 7, 1897 (30 Stat. 84, c. 3), the term "rolls of citizenship" as used in the act of June 10, 1896, was construed to mean "the last authenticated rolls of each tribe which have been approved by the council of the nations and the descendants of those appearing on such rolls," and certain other persons specified that had been lawfully added thereto. By the act of June 28, 1898 (30 Stat. 502, c. 517, § 21), the Commission was authorized and directed to take the roll of Cherokee citizens of 1895 and to enroll all those living found on that roll and certain other persons specified, and "to make correct rolls of the citizens by blood of all the other tribes, eliminating from the tribal rolls such names as may have been placed thereon by fraud, or without authority of law, enrolling such only as may have lawful right thereto and their descendants born since such rolls were made." That act further provided that;

"Said Commission shall make such rolls descriptive of the parties thereon, so that they may be thereby identified, and it is authorized to take a census of each of said tribes," (hence the authorized census card in this case) "or to adopt any other means by them deemed necessary to enable them to make such rolls. They shall have access to all rolls and records of the several tribes. * * * The rolls so made when approved by the Secretary of the Interior shall be final and the persons whose names are found thereon, and their descendants thereafter born to them, with such persons as may intermarry according to tribal laws, shall alone constitute the several tribes which they represent."

The act of March 1, 1901 (31 Stat. 869, c. 676, § 28), provided that all citizens who were living on the 1st day of April, 1899, entitled to be enrolled under the act of June 28, 1898, should be placed upon the rolls. The act of June 28, 1898, was not simply an act of Congress. It embodied and ratified the agreement between the Creek Nation and the United States, which was shortly after ratified by the Creek Nation, that the Dawes Commission should make the final roll of the latter's citizens, that for that purpose the Commission should have access to all its rolls and records, and that it might take a census of the nation or adopt any other means by the Commission deemed necessary to enable them to make such rolls. Among the rolls and records of the Creek Tribe, duly authenticated by the approval of the Creek Council, was a roll of citizens made by the tribe in 1890, another made in 1895, the pay roll of that nation for the year 1895, upon which a per capita payment was made to the citizens of the tribe. On the roll of 1890 appeared "Minnie Atkins (Thos. and Mary, 2 children)." On the roll of 1895 appeared the names of Minnie Atkins and Thomas Atkins and the receipt of Minnie Atkins for a payment to herself and also for a payment of a like amount to her as the per capita payment due to her son Thomas Atkins.

The Creek Tribe was a civilized and intelligent people governed by laws made by its own Creek Council which was composed of two bodies, the House of Kings and the House of Warriors, under whose direction the census of its citizens and its rolls of citizenship were made. Noah Gregory testified that in 1889 and 1890, he was town king of Euchee township and a member of the House of Kings, that under the direction of the Creek Council, and as such town king, he made the original census roll of Euchee township, that after he made up this original census roll he reported it to the Creek Council, that the Creek Council appointed a committee of 16 from its membership, which investigated, purged, and corrected that roll and the rolls of the other towns, some 48 in number, then reported the corrected roll to the House of Kings and to the House of Warriors, and that each house separately approved and adopted it, and this roll thus made is the Creek roll of 1890, that he was a member of the House of Warriors when the roll of 1895 was made, and that it was approved by both Houses. Mr. Gregory testified that after he had made up the original census roll of Euchee township for the enrollment of 1890, he called a convention of the people of that township, that the name of each one of those placed upon the original census roll by him was read out in the hearing of this convention, and with the assistance of suggestion and information made at the convention this original census

roll was corrected, and that it was this corrected roll that he reported to the Creek Council, that on his original census roll under No. 26 were written "Minnie Atkins, two children, female," that the word "female" referred to Minnie Atkins, that on the list which he reported to the council, after the town meeting had purged and corrected it, as his original census roll there appeared "No. 22, Marina Atkins and two children, No. 23, Thomas Atkins, No. 24, Mary Atkins," that at the request of the Dawes Commission he examined the list of those the Commission proposed to enroll as Creek citizens from Euchee township in 1901 and 1902, including Minnie Atkins and Thomas Atkins, obtained what information he could concerning them and reported to the Commission regarding that list, that some on the tentative list he discovered had died before April 1, 1899, and he reported that fact to the Commission, together with any other relevant fact he discovered, but that he does not recollect all that he learned or all the information that he gave, that if he had learned that Thomas Atkins was not living on April 1, 1899, he would have reported, as he did regarding others that were on the tentative list of the Commission, that he died before April 1, 1899, but that he made no such report.

As the Commission was required by the acts of Congress to give full force and effect to the authenticated tribal rolls, the usages and customs of each tribe and was by those acts given access to all their rolls and records, the Creek Rolls of 1890 and 1895, on each of which Minnie Atkins and Thomas Atkins as her son were enrolled as citizens of the tribe by blood, constituted not only prima facie, but, in the absence of strong and persuasive countervailing proof, conclusive evidence before the Commission of the right of Thomas Atkins to enrollment as a citizen of the Creek Tribe. In the face of this record counsel for the plaintiffs no longer contend in this court, as they pleaded in the court below, that "no evidence of any character was produced before, or had or obtained by said Commission with respect to the right of the alleged Thomas Atkins under said act of Congress to be so enrolled," but they now argue that, although all the evidence and information disclosed above was before the Commission, there was no evidence before them that Thomas Atkins was living on April 1, 1899. The answer is, first, that the testimony of Merrick and Lyons tends to show that Merrick, who made the census card, had information that he was living before making that card, and made it in reliance upon such information; and, second, that the authenticated Creek roll of 1895 was conclusive evidence that he was living in that year, and, in the absence of any direct evidence before the Commission that he had died, or that he had been in such a dangerous situation that men of reasonable prudence would infer that he had died, prior to April 1, 1899, the conclusive legal presumption was that he continued to live for at least seven years after the making of the Creek roll in 1895, and hence that he was living on April 1, 1899. In the absence of proof of earlier death, or of evidence of unusual danger of such earlier death, the legal presumption is that a live person continues to live for at least seven years. Fidelity Mutual Life Ass'n v. Mettler, 185 U. S. 308, 316, 22 Sup. Ct. 662, 46 L. Ed. 922; Montgomery v. Bevans, 1 Sawy. 653, 17 Fed. Cas. 628, 633, No. 9,735; N. W. Mutual Life

Ins. Co. v. Stevens, 71 Fed. 258, 260, 18 C. C. A. 107, 109; The San Rafael, 141 Fed. 270, 278, 72 C. C. A. 388, 396; Executors of Clarke v. Canfield, 15 N. J. Eq. 119, 122, 123; Lawson on Presumptive Evidence (4th Ed.) rule 43, pages 251, 253, 255; 13 Cyc. 295, 298, note "b." ·

So it is that all the claims and reasons for the avoidance of the judgment of the Commission and the patents, and for the appointment of a receiver and an injunction on the theory of the original bill, fell disproved by the evidence produced upon the motion for the appointment of the receiver.

But counsel for the plaintiffs presented in that evidence a new issue not set forth in their pleading, which was whether or not there ever was any Thomas Atkins, the son of Minnie Atkins, and whether or not the defendants knew there was no such person before they purchased their title. And counsel now contend that they proved that no such person ever existed and that the defendants were aware of this fact before they became interested in the property in suit. Upon these subjects many witnesses testified. Some of them were weak-willed, dependent, and timorous; some of them were evidently swayed by interest or influence. They testified to occurrences 15 to 20 years before they spoke, and their memories of dates and occurrences were necessarily vague and uncertain. The record convinces that there was an interested and fervent effort on the part of the parties on each side of this litigation to procure favorable evidence for themselves and that much of the testimony introduced is unreliable. Agents of the plaintiffs and of the defendants solicited Minnie Atkins, who seems to have been a timorous, dependent Indian woman, to testify in their favor, and the plaintiffs succeeded in procuring statements from her that she was not the mother of her alleged son, Thomas Atkins, while the defendants obtained statements that he was born and lived her son. At the end of many and continuous solicitations she finally adhered to the latter statement and made affidavit that the former was induced by the overpersuasion of the plaintiffs' agents and her fear of them.

Upon the issue of whether or not Thomas Atkins ever lived, a review of the entire testimony shows it to be conflicting, and that, standing alone, it would have left that issue doubtful. But this testimony is not all the evidence, nor is it the most reliable evidence, upon that issue. There is the Creek tribal roll of 1890, which records Minnie Atkins and two children, Thomas and Mary, there is the Creek tribal roll of 1895, which records Minnie Atkins and Thomas Atkins, there is the receipt of Minnie Atkins upon the pay roll of that year for the payment to her of the per capita allowance for her son Thomas, there is the testimony of the care with which these rolls were made by the town king, corrected by the town meeting, investigated and purged by the committee of the Creek Council, and there is the fact that these rolls were made and approved within 11 years after the alleged birth of Thomas, among the acquaintances of Minnie Atkins, all naturally jealous of and watchful to prevent any undue payment of tribal funds to each other, and there is the fact that under the Creek Agreement the tribe had the right to appear before the Commission and by its agent and its attorney, who during all the enrollment proceedings was un-

der retainer and salary to protect the rights of the tribe, and to prevent the enrollment by the Commission of Thomas Atkins if he was not entitled thereto, and the Creek Agreement that if this was not done the roll of the Commission should be final.

Is it not much more probable that those rolls are right, that Thomas Atkins was living when they were made, and that the people of Euchee township, at whose meetings they were corrected, knew that he was living, and satisfied the officers of the tribe of that fact, than it is that the testimony of witnesses gathered by interested parties to testify to occurrences 20 years behind them tending to show that no such person existed is true? This court will hesitate long to hold on such testimony that Thomas Atkins never existed in the face of these old and hitherto unassailed corrected rolls of the Creek Tribe, and their persuasive evidence of a living Thomas Atkins, the son of Minnie Atkins, when they were made. The proof now before the court that he never existed, that he was a myth, is not clear, unambiguous, convincing or satisfactory to this court.

Nor is there any satisfactory or persuasive evidence that the defendants knew or had notice that Thomas Atkins never existed, before they purchased their lease or title. They had the right to rely and act upon the Creek rolls of citizenship made by the tribe itself and upon the final roll made by the Dawes Commission until they received satisfactory evidence that these rolls were false, and the evidence fails to convince that they ever had such evidence before they purchased.

[8-10] After the court below appointed the receiver, the plaintiffs, with leave of that court, filed an amended complaint, and at the hearing in this court they were permitted to file a copy of it here. In this amended complaint they set forth another ground for the relief they ask. It is, in substance, that the enrollment of Thomas Atkins by the Dawes Commission was induced by the Creek tribal rolls, which as to him were false, that the enrollment of Thomas Atkins on those rolls was fraudulently procured, and that the defendants had notice of these facts before they purchased their titles. Extended consideration of this new basis for relief is pretermitted for two reasons: First, it was not before the court below for its consideration when it appointed the receiver and issued its injunction, and hence it is not pertinent to the determination of the question whether or not there was error in the appointment and issue; second, in so far as this amended complaint was presented to this court to induce its exercise of its jurisdiction in equity to sustain the appointment of the receiver or to appoint another receiver, regardless of the action of the court below, these considerations present themselves. This is a suit in equity. In such a suit the claims of the United States, or of the Creek Tribe, appeal to the conscience of the chancellor with the same, but with no greater or less, force than would those of a private citizen, and, barring the effect of mere delay, they are judicable in a court of chancery, to whose jurisdiction the state or nation or tribe submits them by every principle and rule of equity applicable to the rights of private citizens under like circumstances. State of Iowa v. Carr, 191 Fed. 257, 266, 112 C. C. A. 477, 486; United States v. Stinson, 197 U. S. 200, 204, 205, 25 Sup. Ct. 426, 49 L. Ed. 724; United States v.

Detroit Timber & Lumber Co., 67 C. C. A. 1, 10, 131 Fed. 668, 677; United States v. Chicago, M. & St. P. Ry. Co. (C. C.) 172 Fed. 271, 276; United States v. Chandler-Dunbar Water Power Co., 152 Fed. 25, 26, 27, 37, 38, 40, 41, 81 C. C. A. 221, 222, 223, 233, 234, 236, 237; United States v. Stinson, 125 Fed. 907, 910, 60 C. C. A. 615, 616; Herman on Estoppel, §§ 676, 677; State of Michigan v. Jackson, etc., 16 C. C. A. 345, 351, 69 Fed. 116, 122; United States v. California & Oregon Land Co., 148 U. S. 31, 41, 13 Sup. Ct. 458, 37 L. Ed. 354; Carr v. United States, 98 U. S. 433, 438, 25 L. Ed. 209; Walker v. United States (C. C.) 139 Fed. 409, 411, 412, 413.

The United States has no pecuniary interest in this litigation. The only pecuniary or property interest or equity in the plaintiffs is that of the Creek Tribe, and as the stream cannot rise higher than its source the equities of the United States are no greater and no less than those of the tribe. United States v. Beebe, 127 U. S. 338, 346, 8 Sup. Ct. 1083, 32 L. Ed. 121; French Republic v. Saratoga Vichy Co., 191 U. S. 427, 438, 24 Sup. Ct. 145, 48 L. Ed. 247; State of Iowa v. Carr, 191 Fed. 257, 265, 266, 112 C. C. A. 477, 485, 486; United States v. Detroit Timber & Lbr. Co., 131 Fed. 668, 678, 67 C. C. A. 1, 11; La Clair v. United States (C. C.) 184 Fed. 128, 135, 136; Mountain Copper Co. v. United States, 142 Fed. 625, 629, 73 C. C. A. 621, 625; Chesapeake & Delaware Canal Co. v. United States, 223 Fed. 926, 929, 930, 139 C. C. A. 406, 409, 410, L. R. A. 1916B, 734. Even where equities are equal the defendant prevails. It is only when the case of the complainant appeals to the conscience of the chancellor with the greater force that he will interfere to grant relief, and in equity no one may successfully deny to the damage of another the truth of statements by which he has purposely or carelessly induced another to so change his situation that the assertion of the truth will irreparably or seriously injure him. Hemmer v. United States, 204 Fed. 898, 902, 123 C. C. A. 194, 198; Town of St. Johnsbury v. Morrill, 55 Vt. 165, 169; 2 Pomeroy's Equity Juris. § 739; Illinois Trust & Sav. Bank v. City of Arkansas City, 76 Fed. 271, 293, 22 C. C. A. 171, 193, 34 L. R. A. 518; Paxson v. Brown, 61 Fed. 874, 881, 10 C. C. A. 135, 142; Union Pac. Ry. Co. v. Chicago, R. I. & P. Ry. Co., 51 Fed. 309, 326, 327, 2 C. C. A. 174, 191, 192.

The Creek Tribe made the Creek rolls of 1890 and 1895. By the Creek Agreement (31 Stat. 869, § 28), which it made and ratified, the Creek Tribe contracted with the United States that the Dawes Commission should make the final roll of its citizens and allot them their lands, and that it should base that enrollment on the Creek tribal rolls of 1890 and 1895, and especially upon the latter. It had the opportunity and the privilege to correct and purge its rolls before that tribunal, and it must have had more knowledge and more means of knowledge whether Thomas Atkins was rightly or wrongly enrolled when its tribal rolls were made, and thereafter, while the Commission was sitting, when the acquaintances of Minnie Atkins were living in the tribe and must have known the facts, than the tribe or its members have ever had since. Either purposely or carelessly it failed to correct its roll, if indeed that roll was erroneous, held that roll out to the Commission as correct in the regard here in question, thereby induced that Commission to enroll Thomas Atkins, purposely or care-

lessly held the Commission's roll out as correct, and permitted and induced thereby the allotment of this land to Thomas Atkins, the purchase and improvement of it by the defendants. Between the making of these rolls from 1890 to 1902 and the commencement of this suit a great change in the value of the land, from a few dollars to many thousands of dollars, has occurred, witnesses who knew the facts 16 to 20 years ago must necessarily have died or disappeared, the memory of others has been dimmed with the passage of time, and this tribe first presents its claim that its rolls were fraudulent after all these events, more than 19 years after its last roll was made, and more than 12 years after the final roll of the Dawes Commission became a public record. The equities of the complainants fail to appeal to the conscience of this court with sufficient force to induce it to appoint a receiver for the property in the possession of the defendants, or to sustain the appointment or the injunction already made. The proof in this case is neither clear nor convincing, nor satisfactory that it is probable that the plaintiffs will ultimately recover.

However, this litigation presents claims of some of the parties which have not been material to the decision of the question whether or not the receiver was rightly appointed and the injunction rightly issued, the defendants have offered to give a sufficient bond to protect all parties in interest during the pendency of this suit, and the court is of the opinion that it is wise and equitable to accept and require such a bond. The order of the court will accordingly be that upon the filing in this court within 60 days of the date of the filing of this opinion of a bond with security approved by the judge of the court below in such an amount as shall be fixed by this court on 10 days' notice to be given by Page and Josey to the complainants and the other defendants herein conditioned to account for and pay over to those parties to this suit who shall be finally adjudged to be entitled thereto the profits that have been and shall be derived by them from the land in controversy between March 8, 1915, the date when the receiver was appointed, and the final determination of this suit, to file with the clerk of the court below a verified account of the operation of the property showing generally the expense, the proceeds and the profit thereof between March 8, 1915, and May 1, 1916, on or before August 1, 1916, to file on or before the 25th of each month, commencing on June 25, 1916, such an account of the operation thereof during the preceding month, to pay to the parties ultimately adjudged entitled thereto any damages resulting to them from the negligence or mismanagement of the property, and to abide by and perform the further orders of this court and of the court below in the premises, the order of the court below dated March 8, 1915, appointing the receiver, directing the defendants to deliver the possession of the land, improvements and property to him and enjoining the defendants from operating or interfering with it, shall be in all things reversed and set aside, and this case shall be remanded to the court below for further proceedings not inconsistent with the views expressed in this opinion; and it is so ordered.

CARLAND, Circuit Judge, concurs in result.